USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/20/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

GEORGE PHILIP, REX WOODLEY, and MOHAMMED :
NAZIM UDDIN,                                   

                                           Plaintiffs,     :

                    -v-                            :

GTECH CORPORATION and MICHAEL FEILER, *in his* :
*individual and professional capacities*,

                                   Defendants.   :

------------------------------------------------------------------------X

14 Civ. 9261 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

     Plaintiffs George Philip, Rex Woodley, and Mohammed Nazim Uddin—current and

former employees of defendant GTECH Corporation ("GTECH"), where defendant Michael

Feiler was their supervisor—bring claims of employment-related misconduct under Section 1981

of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); New York State Human Rights Law, N.Y.

Exec. Law §§ 290 *et seq.* ("NYSHRL"); and New York City Human Rights Law, N.Y. City

Admin. Code §§ 8–101 *et seq.* ("NYCHRL"). Defendants now move for summary judgment on

all claims. For the following reasons, the Court denies the motion as to all claims brought by

Philip and Uddin. However, the Court grants summary judgment for defendants as to all but one

of Woodley's claims: his federal, state, and municipal claims of discrimination, and his federal

and state (but not municipal) claims of a hostile work environment.

I.      **Background**

    A.      **Procedural History**

    On November 20, 2014, Philip and Woodley filed the Complaint.  Dkt. 2.  On February

6, 2015, defendants answered and moved to sever.  Dkts. 10–13.  On February 13, 2015,

plaintiffs filed the First Amended Complaint, Dkt 16 ("FAC"), adding Uddin as a plaintiff.  On

February 27, 2015, the Court denied the motion to sever without prejudice.  Dkt. 19.  On March

13, 2015, defendants answered the FAC.  Dkt. 28.  On August 14, 2015, plaintiffs filed the

Second Amended Complaint, Dkt. 49 ("SAC"), adding claims by Philip and Uddin.  *See* Dkt. 48

(granting leave to amend).  On August 28, 2015, defendants answered the SAC.  Dkt. 56.

    As ultimately pled in the SAC, plaintiffs bring the following claims:

- Philip brings claims for (1) race discrimination, (2) retaliation, and (3) hostile work
    environment under Section 1981, Title VII, the NYSHRL, and the NYCHRL.

- Woodley brings claims for (1) race discrimination, and (2) hostile work environment
    under Section 1981, the NYSHRL, and the NYCHRL.

- Uddin brings a claim for hostile work environment under Section 1981, Title VII, the
    NYSHRL, and the NYCHRL.

    On December 18, 2015, the parties filed a Joint Stipulation of Facts.  Dkt. 67 ("JSF").

On January 22, 2016, defendants moved for summary judgment.  Dkt. 68.  Defendants filed a

Rule 56.1 Statement of Material Facts, Dkt. 69 ("Def. 56.1"), and a memorandum of law as to

each plaintiff.  Dkt. 76 ("Def. Woodley Br."); Dkt. 77 ("Def. Philip Br."); Dkt. 78 ("Def. Uddin

Br.").[1]  On February 19, 2016, plaintiffs filed a Rule 56.1 Counterstatement, Dkt. 86 ("Pl. 56.1"),

---

[1] Defendants also filed the declarations of Theo E.M. Gould, Dkt. 70 ("Gould Decl."); Michael
Feiler, Dkt. 71 ("Feiler Decl."); Christopher Costanza, Dkt. 72 ("Costanza Decl."); Frank
Dimino, Dkt. 73 ("Dimino Decl."); Julie Doti, Dkt. 74 ("Doti Decl."); and Michael Sasso, Dkt.
75 ("Sasso Decl.").

and memoranda of law opposing summary judgment.[2]  Dkt. 83 ("Pl. Philip Br."); Dkt. 84 ("Pl.

Woodley Br."); Dkt. 85 ("Pl. Uddin Br.").  On March 4, 2016, defendants filed reply briefs.[3]

Dkt. 92 ("Def. Woodley Reply"); Dkt. 93 ("Def. Philip Reply"); Dkt. 94 ("Def. Uddin Reply").

On May 17, 2016, the Court heard argument.  Dkt. 100 ("Tr.").

### B.    Facts

The Court begins by reviewing undisputed facts relating to GTECH's business and

operations.  It then recounts facts—disputed and undisputed—relevant to each plaintiff's

claims.[4]  Disputed facts as to which each party's version is adequately supported by record

evidence are construed in the light most favorable to plaintiffs.

### 1.    GTECH

GTECH, headquartered in Rhode Island, is a provider and servicer of lottery and gaming

machines.  JSF ¶ 1.  GTECH employs Field Service Technicians ("FSTs") to install, repair, and

maintain lottery and gaming equipment.  *Id.* ¶ 2.  Before August 2013, GTECH maintained

depots—which serve as home bases for the FSTs—in Queens and the Bronx; GTECH then

---

[2] Plaintiffs also filed the declaration of Lawrence M. Pearson, Dkt. 87 ("Pearson Decl."), and the affidavits of George Philip, Dkt. 88 ("Philip Aff."); Rex Woodley, Dkt. 89 ("Woodley Aff."); and Mohammed Nazim Uddin, Dkt. 90 ("Uddin Aff.").  Partial transcripts of the key depositions in this case were attached to the Pearson Declaration.  *See* Pearson Decl., Ex. 1 ("Philip Dep."); *id.*, Ex. 2 ("Woodley Dep."); *id.*, Ex. 3 ("Uddin Dep."); *id.*, Ex. 4 ("Feiler Dep."); *id.*, Ex. 5 ("Wyllie Dep."); *id.*, Ex. 6 ("Dimino Dep."); *id.*, Ex. 7 ("Hamilton Dep."); *id.*, Ex. 8 ("McDonald Dep.") *id.*, Ex. 9 ("Pierre Dep."); *id.*, Ex. 10 ("Doti Dep.").  Plaintiffs provided the full transcripts of the Philip, Woodley, Uddin, Feiler, and Wyllie depositions to the Court on a CD.

[3] Defendants also filed the supplemental declaration of Theo E.M. Gould.  Dkt. 95 ("Gould Supp. Decl.").

[4] Each plaintiff's case largely stands apart from the others, except to the extent that "[r]emarks targeting members of other minorities . . . may contribute to the overall hostility of the working environment for a minority employee."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  Nothing in this decision should be construed to commit the Court to a view of whether any eventual trial should or should not be bifurcated.

closed its Queens facility and moved to a larger facility in the Bronx where approximately 25 GTECH employees worked at any given time. *Id.* ¶ 3.

Most of an FST's shift is spent in the field; GTECH provides FSTs with vans to travel to and from locations in their assigned work zones. *Id.* ¶¶ 2, 4. FSTs use a software application called Cadence on their GTECH-issued phones, which assigns them to service calls and monitors their status. *Id.* ¶ 5. Generally, FSTs are supposed to indicate when they have accepted a service call, when they are traveling to it, when they are working on it, and when they have completed it. *Id.* Daily activity logs reflect the calls completed by each FST during each shift. *Id.* Cadence also has a GPS feature designed to transmit the location of each FST's GTECH-issued phone. *Id.* ¶ 6.

Each FST reports to a Field Service Supervisor ("FSS") based at the depot; the FSS supervises the performance of assigned FSTs, coordinates schedules, and keeps records and payroll. *Id.* ¶ 8. The FSSs, in turn, report to a Field Service Manager ("FSM"), who oversees day-to-day operations at the depot, handles customer complaints, and supervises the FSSs and FSTs. *Id.* ¶ 9. From December 2012 to November 2014, defendant Feiler, who is Caucasian, was an FSM in the Queens and Bronx depots.[5] *See* JSF ¶ 12; Feiler Decl. ¶ 2. At all relevant times, Lynn Wyllie was a Senior Human Resources Manager with responsibility for the Bronx depot. *See* Wyllie Dep. 20–23.

### 2.     Philip

In early July 2013, Philip, who is African-American, applied for an FSS position with GTECH. JSF ¶¶ 11, 13. He interviewed with Feiler and several other GTECH supervisors. *Id.* ¶ 17. On July 17, 2013, GTECH offered Philip the position, which he accepted. *Id.* ¶ 18.

---

[5] Feiler reported to the off-site Senior Director of Field Services ("SDFS"), who at all relevant times was Christopher Costanza. JSF ¶ 10; *see also* Costanza Decl. ¶ 2.

Although defendants maintain that Feiler alone made the "ultimate" decision to hire Philip in July 2013, Def. 56.1, ¶ 42, Philip testified that Feiler told him at his final interview—with Feiler and Costanza—that the "final decision" would be made by the more senior Costanza.  Philip Dep. 149.  Costanza did not testify as to who made the "final decision."  *See* Costanza Decl.

On July 22, 2013, Philip began his employment.  JSF ¶ 19.  As an FSS working under Feiler in the Bronx depot, Philip was responsible for supervising FSTs assigned to Manhattan, Brooklyn, and Queens.[6]  *Id.*

Philip and others testified that, during Philip's brief employment, they heard Feiler use racial slurs in reference to and in the presence of African-American employees, including Philip. Three particular occasions stand out.  First, Philip testified, on one occasion around late-November/early-December 2013,[7] he was at a restaurant with Feiler and another employee when Feiler said, "They're acting like they've never seen any niggers in here."  Philip Dep. 275. Second, on another occasion around the same time, Philip testified that he heard Feiler say, referring to a group of FSTs, "monkeys can be trained to do this faster than these niggers."  *Id.* at 279.  Third, Uddin testified that he heard Feiler say to Philip, referring to other African-American employees, "I cannot deal with these niggers," and that Feiler also, at the same time, called the employees "lazy monkeys."  Uddin Dep. 99, 124, 128, 130.

Philip testified that he heard Feiler use the term "nigger" at least three times, *see* Philip Dep. 557, and that Feiler would mutter that word under his breath when talking to or about Philip, *see id.* at 556–61.  Uddin testified that he heard a manager use that slur "many times."

---

[6] The other FSS in the Bronx depot was Frank Dimino, who is Caucasian.  JSF ¶ 20.

[7] This timing may be inferred because Philip testified that he complained about this comment to Wyllie "two or three weeks before my first writeup," which, as noted below, was in mid-December 2013.  Philip Dep. 274–75.

Uddin Dep. 120; *see also* Doti Decl., Ex. A (notes reflecting that Uddin told investigator in 2014 that "[Feiler] screamed the 'N-word' at [Philip] a few months ago.  I heard him say something about 'those niggers.'").

There is also testimony that Feiler used the term "monkey" in apparent reference to African-American employees—including Philip—"a lot."  Philip Dep. 557.  For instance, Philip testified that Feiler once said that "[e]ven a monkey could do" the task Philip was performing. *Id.* at 558.  And Uddin testified that he heard Feiler, passing by Philip's office, utter the phrase "lazy monkeys."  Uddin Dep. 157–59.  Uddin also testified about two other specific occasions where Feiler referred to employees as "monkeys" or "lazy monkeys."  *See id.* at 143–44, 163–64.

There is also evidence that Feiler treated Philip worse than white supervisors.  *See* Philip Dep. 600–02; Uddin Dep. 99–100, 110–15.  For instance, Uddin testified that Feiler interfered with Philip's work performance by assigning his duties to a subordinate and failing to alert him about meetings, preventing him from preparing.  *See* Uddin Dep. 110–15.  According to Philip, Feiler also refused to allow Philip to drive his GTECH-issued van home, although he allowed other employees to do so.  *See* Philip Dep. 237–43.

Further, there is testimony that Feiler frequently screamed and cursed at Philip and talked down to him in front of other employees.  *See id.* at 600–02; McDonald Dep. 53–54 (testifying that, although Feiler screamed and cursed at Philip's white predecessor, Feiler treated Philip "worse").  In 2014 interviews with an HR investigator looking into Feiler's conduct, other GTECH employees similarly stated that Feiler was particularly harsh with Philip.  *See* Doti Decl., Ex. U (asked if Feiler treated anyone worse than others, stating that Feiler "was very rude" with Philip); *id.*, Ex. N (stating "I have only seen [another African-American employee] and [Philip] spoken to inappropriately").

Philip testified that, in or about late November or early December 2013, he complained orally to Wyllie about Feiler.  *See* Philip Dep. 274 (identifying time period as "two or three weeks before my first write-up").  In that conversation, according to Philip, he told Wyllie about two of Feiler's recent comments ("They're acting like they've never seen any niggers in here" and "monkeys can be trained to do this faster than these niggers").  *See id.* at 275–81.  According to Philip, Wyllie soon thereafter told him that she relayed to Feiler "everything" Philip had said. *See id.* at 548–50.[8]  After that, Philip testified, he did not trust Wyllie.[9]  *See id.* at 550.

On December 16, 2013—two or three weeks after Philip's conversation with Wyllie, *see id.* at 274—Feiler gave Philip a "Corrective Action" for failing to submit timecards in a timely and accurate fashion.  *See* Pearson Decl., Ex. 23.  The Corrective Action stated that "we will be issuing you a Performance Improvement Plan," which would "clearly outline the areas in which you need development and provide you with the opportunity for overall performance improvement."  *Id.*  Philip submitted a brief statement disagreeing that a Corrective Action was necessary.  *See id.*  Philip noted that he had only "input payroll 9 times" and "expect[ed] to make mistakes," which was why he asked another employee "to look and see if everything was ok."

---

[8] Feiler himself testified that he "found out during all this after the fact that [Philip] went to [Wyllie] with some allegations," including about Feiler's use of the word "nigger."  Feiler Dep. 493.  He testified that he heard about Philip's complaint "[d]iscussing it with [Wyllie] afterwards."  *Id.*  Feiler then appeared to recant this testimony, stating that he "didn't have the conversation with Ms. Wyllie."  *Id.* at 494.  The jury could, however, credit Feiler's initial admission and conclude that he had learned about Philip's complaint shortly after it was made (although Feiler's testimony is ambiguous as to the timeframe).  In other words, a reasonable jury could find that Feiler essentially confirmed Philip's testimony as to this point.

[9] There is evidence that other employees similarly distrusted HR.  *See* Uddin Dep. 148 ("Every time we call or send an e-mail, they will call Mike Feiler right away."); McDonald Dep. 145 ("It seems to me if somebody have a problem and go to HR, they wait until you finish talk and then they call [Feiler]."); Pearson Decl., Ex. 14 (employee Britton telling GTECH internal investigator that HR personnel told Feiler about a conversation meant to be confidential; Feiler then allegedly said to Britton, "You think they wouldn't tell me?  They tell me everything you said.").

*Id.* Feiler acknowledged in his deposition that, of two timecard-related errors for which Philip was written up, Philip caught one of them. *See* Feiler Dep. 278. Non-party Edwin McDonald testified that he "never see[n] any supervisor get written up just like that so quick." McDonald Dep. 57.

On January 27, 2014, Feiler issued Philip the promised Performance Improvement Plan ("PIP"). *See* Gould Supp. Decl., Ex. A ("PIP"). The PIP is reproduced below:



Case 1:14-cv-09261-PAE-JLC   Document 95-1   Filed 03/04/16   Page 2 of 3



## GTECH®

## *Performance Improvement Plan*

**Employee Name:** George Philip
**Job Title:** FS Supervisor
**Manager's Name:** Mike Feiler
**Date Issued:** January 27, 2013

The purpose of this Performance Improvement Plan is to identify any performance issues, the expectations and the timeframe in which to display improvement.  We will meet periodically throughout the time period to gauge your performance against the standard.  This is the first step in the Corrective Action Process.  If there is no significant improvement as outlined below, further Corrective Action will be forthcoming.  However, I am confident that by utilizing this Performance Improvement Plan, we can meet these objectives to allow you to succeed.

| PERFORMANCE ISSUE | EXPECTATION | ACTION STEPS | MET EXPECATIONS (Y/N) RESULTS (30-60-90) |
|---|---|---|---|
| Communication | • Improve overall <u>oral communication</u> skills by working on addressing large groups or audiences. Ensure that you are properly articulating your message and validate what you intend to say is the message that is received.<br>• Be timely in responding to emails.  Be descriptive in <u>written communications</u> so that the intended audience has a clear understanding of the situation and they have the ability to ask questions and receive clarification on the matters at hand.<br>• Managing your Email: PD-SS-249<br>• Listening Essentials: The Basics of Listening PD-SS-289<br>• Interpersonal Communicating: Listening Essentials PD-SS-262 | <u>Oral Communications</u>:  FSM will monitor FST meetings to ensure messages are clear and information is accurately received.<br><br><br><u>Written Communications</u>: Emails must be responded to on the same day in which it was received.  If more time is needed to resolve a matter, you must respond to the sender informing them of such.  Written communications must be clearly written and concise. | 30<br><br>60<br><br>90<br><br><br><br><br><br><br><br><br><br><br>30 |
| Performance & Task Management | • Employees must be held <u>accountable</u> for all assigned projects, customer-facing tasks and overall performance.<br>• Improve <u>time management</u> | <u>Accountability</u>.  FST reports must be accessed daily, reviewed for inconsistencies in FST performance, queue monitoring should happen periodically throughout the day.<br><u>Time Management</u>. | 30<br><br>60<br><br>90 |

D005020

| | | | |
|---|---|---|---|
| | and organization skills, ensuring that he is working efficiently and to the best of his ability. | • Develop document (checklist) for daily activities and present to FSM for review.<br>• Document work activities every 30 minutes for 5 working days to ensure working efficiently. | Due within a week.<br><br>Due every morning. |
| | • Work on identifying and properly delegating responsibilities, ensuring that he is working on supervisory-level tasks and optimizing opportunities for employee development. | Reviews should happen daily with FSM on FST/Customer activities to ensure information sharing is accurate and reporting is in a timely fashion and without error | Daily Updates. |
| FS Employee Development | • Improve performance of low performers and provide on-going refresher training. | Identify low performers and develop action plan for these FSTs to ensure performance improvement. | Due within 2 weeks.<br><br>30<br><br>60 |
| Training of New Hires | • New hires must be properly on-boarded and trained.<br><br>• Proper tools and safety equipment must be issued and tracked. | Develop training document (checklist) for all New Hires to ensure they are prepared to go into the field.<br><br>Develop checklist all the equipment , laptop, and tools provided to new hires. | Due within 2 weeks.<br><br>Due within 2 weeks.<br><br>Review progress of all new hires weekly. |
| Time & Attendance | • Proper reporting of schedules and timecards.<br><br>• Proper accounting of all FS's in Cadence. | Work with site administration to ensure proper time reporting steps. Understand corporate time off policies and reporting.<br><br>Accurately update all Cadence records daily to ensure proper FST time management. | 30<br><br>60<br><br>90 |
| Facilities | • Organization of depot. | Develop depot process document for FSTs dropping off/picking up of equipment, screening activities, parts management. | Due within 2 weeks.<br><br>Review weekly. |

_____        _____
Employee Signature                                         Date   1-27-14

_____        _____
Manager Signature   Michael Failes                   Date   1-27-14

_____        _____
Human Resources Signature                            Date

D005021

10

About a month later, in late February 2014, Philip complained to Wyllie again, this time orally and in writing.  *See* Pl. 56.1, ¶¶ 84–85.  On February 27, 2014, Philip emailed Wyllie, *inter alia*, a two-page list of grievances against Feiler that mentioned his "unprofessional attitude," "harassment," "discrimination," and "hostile work environment."  *See* Pearson Decl., Ex. 26.  Moreover, Philip testified, he also spoke to Wyllie after sending this email, and in that conversation he more explicitly discussed "racist remarks"—including "comparing technicians to niggers and monkeys"—that he had left out of the two-page grievance because he did not feel comfortable leaving a written record.  Philip Dep. 268; *see also id.* at 296 (Philip "felt very uncomfortable" writing anything down).

On March 17, 2014, Philip was fired.  JSF ¶ 22.  Feiler testified that he decided to fire Philip after consulting with Wyllie, Costanza, and others.  *See* Feiler Dep. 456–57.  Wyllie testified that she and Feiler jointly decided to terminate Philip.  *See* Wyllie Dep. 337–38.  After coming to that decision, according to Wyllie, their recommendation was forwarded to two executives who "agreed that it was the right decision" and that Costanza "was informed and/or agreed."  *Id.* at 341.

The firing decision was reflected in another Corrective Action, which stated that "[d]ue to the lack of initiative and improvement in the areas documented over the past six (6) weeks," Philip's employment would be terminated immediately.  *See* Pearson Decl., Ex. 28.  The grounds for termination were set out more fully in a "Progress Update" dated March 7, 2014, which Feiler drafted and was attached to the Corrective Action.  *See* Pearson Decl., Ex. 25 ("Progress Update"); Feiler Dep. 465–66 (testifying that he drafted the Progress Update, although Wyllie may have edited it).  The Progress Update reproduced the contents of the PIP, except that the

right-most column was filled in with comments about Philip's recent performance on the expectations and "action steps" set forth in the PIP.

The Progress Update is reproduced below:

 **GTECH®**

*Performance Improvement Plan*

**Employee Name:** George Philip
**Job Title:** FS Supervisor
**Manager's Name:** Mike Feiler
**Date Issued:** January 27, 2013
**Progress Update:** March 7, 2014

The purpose of this Performance Improvement Plan is to identify any performance issues, the expectations and the timeframe in which to display improvement. We will meet periodically throughout the time period to gauge your performance against the standard. This is the first step in the Corrective Action Process. If there is no significant improvement as outlined below, further Corrective Action will be forthcoming. However, I am confident that by utilizing this Performance Improvement Plan, we can meet these objectives to allow you to succeed.

| PERFORMANCE ISSUE | EXPECTATION | ACTION STEPS | PROGRESS RESULTS (30-60-90) |
|---|---|---|---|
| Communication | • Improve overall oral communication skills by working on addressing large groups or audiences. Ensure that you are properly articulating your message and validate what you intend to say is the message that is received.<br>• Be timely in responding to emails. Be descriptive in written communications so that the intended audience has a clear understanding of the situation and they have the ability to ask questions and receive clarification on the matters at hand.<br>• Managing your Email: PD-SS-249<br>• Listening Essentials: The Basics of Listening PD-SS-289<br>• Interpersonal Communicating: Listening Essentials PD-SS-262 | Oral Communications: FSM will monitor FST meetings to ensure messages are clear and information is accurately received.<br><br><br>Written Communications: Emails must be responded to on the same day in which it was received. If more time is needed to resolve a matter, you must respond to the sender informing them of such. Written communications must be clearly written and concise. | Throughout the first 30 days, there has been no communication initiated by George on the day-to-day activities.<br><br>George responds sporadically.<br><br><br>To-date, has not completed courses. George mentioned to Lynn during Feb-28 visit that he attempted to register for these classes. However, per Learning Services, the last attempt to register for online classes was December 2013. George should have discussed any technical difficulties with accessing these |

| | | | | trainings with Mike or reach out to others for assistance. |
|---|---|---|---|---|
| Performance & Task Management | • Employees must be held accountable for all assigned projects, customer-facing tasks and overall performance. | Accountability. FST reports must be accessed daily, reviewed for inconsistencies in FST performance, queue monitoring should happen periodically throughout the day. | | George has not discussed any inconsistencies or issues with FST performance with Mike. On occasion, Mike has asked what work is in the cue and George's response is "I haven't looked at it yet. |
| | • Improve time management and organization skills, ensuring that he is working efficiently and to the best of his ability. | Time Management. • Develop document (checklist) for daily activities and present to FSM for review. • Document work activities every 30 minutes for 5 working days to ensure working efficiently. | | George was to provide a daily activities list documenting his activities. He had to be asked to submit these to manager. George provided Mike with 4 daily activity lists which were late and only received upon request. On February 28, 2014, George did provide Lynn with 7 updates out of a 20 day work schedule. They were not provided to Mike on-time as outlined. |
| | • Work on identifying and properly delegating responsibilities, ensuring that he is working on supervisory-level tasks and optimizing opportunities for employee development. | Reviews should happen daily with FSM on FST/Customer activities to ensure information sharing is accurate and reporting is in a timely fashion and without error. | | George was to update manager on FST and Customer activities. George would only update manager when he was brought into the manager's office and asked for an update. |
| FS Employee Development | • Improve performance of low performers and provide on-going refresher training. | Identify low performers and develop action plan for these FSTs to ensure performance improvement. | | Due within 2 weeks. As of Feb-28-14, nothing submitted. |
| Training of New Hires | • New hires must be properly on-boarded and trained. | Develop training document (checklist) for all New Hires to ensure they are prepared to go into the field. | | This was due within 2 weeks. George did not submit any documentation to Mike. He did take the "Manager's On-Boarding Checklist" and complete it for his most recent new hire, however, he didn't |

Confidential

D004600

|  |  |  | develop an FST-specific training. This was provided to Lynn. |
|---|---|---|---|
|  | • Proper tools and safety equipment must be issued and tracked. | Develop checklist all the equipment , laptop, and tools provided to new hires. | Submitted an equipment checklist for new hire Anthony Lee (to Lynn, but did not submit to Mike.) |
|  |  |  | Review progress of all new hires with Mike weekly which he has not provided update to Mike. |
| Time & Attendance | • Proper reporting of schedules and timecards.<br><br>• Proper accounting of all FS's in Cadence. | Work with site administration to ensure proper time reporting steps. Understand corporate time off policies and reporting.<br><br>Accurately update all Cadence records daily to ensure proper FST time management. | Additional, errors in time recording. Most recent was on Mar-3 when George submitted time incorrectly for 4 employees; inaccurately recorded 48 hours rather than 40. |
| Facilities | • Organization of depot. | Develop depot process document for FSTs dropping off/picking up of equipment, screening activities, parts management. | This was due within 2 weeks of PIP. He did submit a sign-in sheet but no activities were recorded. This was submitted to Lynn, however, not provided to Mike. (The sheet submitted to Lynn was actually provided to FST IIIs by Mike.) |

_Does not agree, refuses to sign_
**Employee Signature**                                    _3-17-14_
                                                          **Date**

_Michael Feiler_
**Manager Signature**                                     _3-17-14_
                                                          **Date**

_Lynn Wells_
**Human Resources Signature**                             _3-17-14_
                                                          **Date**

Confidential                                                      D004601

Philip contests defendants' characterization of his work performance. Philip submitted an affidavit along with his opposition brief, stating that he "performed the tasks required of me in my PIP to Feiler by the deadlines he had communicated to me." Philip Aff. ¶ 22; *see id.* ¶¶ 23–32 (addressing each identified deficiency).

### 3. Woodley

Woodley—an African-American man who lived, at all relevant times, in Queens—worked as an FST for GTECH starting in December 1994. JSF ¶¶ 23–26. His assigned work zone was Manhattan, *id.* ¶ 26, and he came to the Bronx depot only about once a week. *See* Pl. 56.1, ¶ 151. On September 5, 2013, GTECH fired Woodley. JSF ¶ 28. The proffered reason for this termination was that Woodley was "stealing time," *i.e.*, that he was not doing work when he was supposed to be.

Several different supervisors testified that, over several months in 2012 and 2013, they observed suspicious patterns in Woodley's GPS reports that suggested he was not in Manhattan when his shift started and/or that he was tampering with his phone and its GPS functionality.

Greg Hamilton, an African-American supervisor, testified that, in 2012, he observed that Woodley would start his shift at least three hours late and appeared to be at home when he should have been in Manhattan.[10] *See* Hamilton Dep. 65–66. Hamilton testified that he then spoke to Woodley, who explained that he had been fixing parts at home. *See id.* at 66–67. Woodley was aware that he was required to start his shift in Manhattan. *See* Pl. 56.1, ¶ 113.

---

[10] Woodley asks the Court to discount all of Hamilton's testimony as "not credible" because Hamilton appeared to change his testimony on an entirely separate matter after consulting with defendants' lawyers during a break in his deposition. *See* Pl. 56.1, ¶¶ 103–05 (citing *id.* ¶ 57). The Court cannot make such a credibility determination on summary judgment. Woodley does not point to any record evidence contradicting Hamilton's testimony about his conclusions regarding Woodley's conduct in 2012. *See id.* ¶ 103.

Feiler testified that, in February 2013, he noticed a similar pattern in which Woodley's phone would be activated early in the morning in Queens—at the start of Woodley's shift—but then would shut down, only to reappear in Woodley's Manhattan work zone hours later.  *See* Pl. 56.1, ¶ 106.  Feiler asked FSS Frank Dimino to look into Woodley's GPS reports; Dimino concluded that Woodley was turning his phone off for extended periods and was at home in Queens at the start of his shift.  *Id.* ¶ 109.  Woodley does not dispute that Dimino came to this conclusion.  *See id.*  Dimino and another supervisor then had a conversation with Woodley about "making sure [his] GPS device was on at all times."  Woodley Dep. 106.

Feiler further testified that, in August 2013, he noticed the same pattern as in February: Woodley's GPS locator would turn on at the start of his shift in Queens and then turn off for two to three hours.  Pl. 56.1, ¶ 117.  Feiler again asked Dimino to review the records more carefully.  Dimino, undisputedly, concluded that, during a two-week period in August, Woodley consistently took several hours to arrive at his first customer in Manhattan after the time he accepted the call in Cadence.  *Id.* ¶ 119; *see also* Dimino Decl., Exs. A–I (customer call logs for August 8–10, 14–17, 20, and 22).

For his part, Woodley challenges the reasonableness of Hamilton's, Feiler's, and Dimino's conclusions by impugning the GPS reports as "unreliable."  Pl. 56.1, ¶ 103; *see also* Pearson Decl., Ex. 51 (map of GPS data showing impossible 13-minute roundtrip journey between Queens and Manhattan).  And there is indeed some evidence that the GPS often put FSTs in the "wrong place."  McDonald Dep. 128; *see also id.* at 55 (incident where GPS indicated he was in New Jersey when he was actually in the Bronx).  Woodley also offers evidence that Feiler and others at GTECH were aware of such malfunctions.  *See* Feiler Dep. 110 ("[P]eople come in and say that the GPS wasn't working. . . . [T]hey would say it was the phone,

17

it was the area.  That was just a normal complaint that came from everywhere."); *id.* at 113

(some FSTs complained about "dead spots" where "they hit areas that the phone wasn't working.

The GPS would go on and off.").  However, Dimino also testified that some FSTs knew how to

turn off the GPS locator, and that, if the problem had been purely technical, he would expect to

see more "sporadic" gaps in Woodley's GPS reports—not hours-long gaps.  Dimino Dep. 135–

37; *see id.* at 244–45 (testifying that he believed Woodley sometimes had trouble with his phone,

but not when "blank spots" were "repetitive").

 Besides challenging the reliability of the GPS data, Woodley explains the pattern

observed in his GPS reports by testifying that he spent several hours at the beginning of his shifts

fixing parts in his van while parked in Manhattan.  *See* Woodley Dep. 157–59, 375–79.  This,

Woodley explained, minimized the disruption to his clients' businesses (because lottery vendors

experience heavier traffic in the morning).  *See id.* at 378–79.  There is evidence that this practice

was known to and appreciated by Woodley's supervisors, although there is competing evidence

that it was frowned upon.  *Compare* Pearson Decl., Ex. 33 (Dimino praising Woodley in

performance review for "making repairs to the equipment in the field"), *with* Philip Dep. 497

(testifying that he "would have had" Woodley fix parts in the depot).

 To test GTECH's suspicions about Woodley's time theft, on August 23, 2013, Philip

joined Woodley for a "ride-along."  JSF ¶ 27.  During the ride-along, Woodley's GPS worked

properly and Woodley completed five customer calls before noon.  Pl. 56.1, ¶¶ 129–30.  Feiler

concluded that Woodley theretofore must have been tampering with his phone.  *Id.* ¶ 132.  This

ride-along was the only means of confirming Woodley's misconduct.  *See* Wyllie Dep. 221;

Feiler Dep. 399–400.  (By contrast, when another African-American FST named Vinnie Allred

was similarly suspected of stealing time, Feiler visited Allred's home twice to confirm the suspicion, and even then Allred was merely written up, not fired.  *See* Feiler Dep. 336–39.)

After the ride-along, Feiler asked Dimino and Philip to meet with Woodley.  Pl. 56.1, ¶ 134.  Whether Woodley told Dimino and Philip that he was repairing parts at home, rather than in his van in Manhattan, is disputed.  *See* Feiler Dep. 385–88; Philip Aff. ¶ 35; Woodley Dep. 331.  It is undisputed, however, that Woodley told Wyllie that he was repairing parts in his van, often on 57th Street in a commercial parking lot, but sometimes downtown or uptown.  *See* Woodley Dep. 55–56, 155.  Woodley testified that he would disappear from the GPS for several hours at a time because of "dead zones" in these areas.  *See id.* at 159–60 ("Actually, the whole of Manhattan is a dead zone when it comes to GPS. . . .  GPS does not work in Manhattan.").

Concluding that Woodley had been stealing time, Feiler decided to fire him.  *See* Pl. 56.1, ¶ 146.  Wyllie and Costanza agreed with this decision:  Wyllie testified that she and Feiler made the decision together, *see* Wyllie Dep. 319, while Costanza stated that his opinion was that Woodley was "playing games" and that termination may be appropriate.  *See* Costanza Decl., Ex. E.  Under GTECH policy, only "gross misconduct" should give rise to immediate termination, *i.e.*, before formal coaching and written warnings.  *See* Pearson Decl., Ex 44 ("GTECH HR Training Slideshow"); Wyllie Dep. 83–84.  Woodley's termination notice did not list any prior warnings and described his "Violation Type" as "Misconduct."  *See id.*, Ex. 34 ("Woodley Termination Notice").

Shortly after his firing, Woodley wrote a letter to an African-American GTECH manager stating, *inter alia*, that he took "full responsibility for not running my GPS."  *Id.*, Ex. 57 ("Woodley 9/11/13 Letter").  Woodley also complained that he had been fired without any warning, and that he had only been told on August 23, 2013 to keep his GPS on.  *Id.*

As for evidence that his termination was motivated in part by race, Woodley testified that, on one occasion, he heard Feiler refer to another African-American FST as a "lazy nigger." Woodley Dep. 185–92.  On another occasion, Woodley testified, Uddin told him that Feiler had used either the term "niggers" or "monkeys" to refer to African-Americans.  *Id.* at 369–70.[11] Finally, Uddin testified that Woodley was next to him when they both heard Feiler say, "I cannot deal with these niggers."  Uddin Dep. 145–46.  Uddin then told Woodley "every day [Feiler] be doing this to us."  *Id.* at 146.  Woodley, however, identified the "lazy nigger" comment as the only time he personally heard Feiler use that slur.  Woodley Dep. 201.

### 4.    Uddin

Uddin, who was born in Bangladesh and is Muslim, has been employed at GTECH as an FST since 2003, and currently works out of the Bronx depot.  JSF ¶¶ 29–31.  Since the start of his employment, Uddin has never: (1) received any disciplinary write-up; (2) been put on a performance improvement plan; (3) been suspended or placed on furlough; (4) been demoted, transferred, or moved to a different work zone; or (5) had any change in his job duties and responsibilities.  *Id.* ¶ 33.

In or around June 2011, Uddin complained to a GTECH supervisor, Michael Sasso, that some coworkers had called him names such as "terrorist" and "Taliban" and put pictures of George Bush, Hillary Clinton, and Osama bin Laden in his mailbox or locker.  *Id.* ¶ 34.  Uddin also testified that, around this time, he was called "terror chicken" and told to "go get some terror chicken."  Uddin Dep. 237.

---

[11] Additionally, several witnesses, including Woodley and Uddin, testified that Dennis Schilling, Philip's predecessor, told them after he left GTECH that Feiler had a racially motivated "hit list." *See* Pl. 56.1, ¶¶ 410–12.  This evidence is inadmissible hearsay and must be disregarded for purposes of this motion.

More recently, during Feiler's tenure, there is evidence that Uddin's van was singled out for searches. Philip testified about an incident, sometime in the middle of his short tenure (*i.e.*, in fall 2013) where Feiler said he "might find a bomb in here" and "there might be a terrorist up in here." Philip Dep. 304–06. According to Philip, Feiler was "constantly searching [Uddin's] vehicle when he never searched anyone else's vehicle in all the company." *Id.* at 541. Uddin testified that Feiler would "open[] my vehicle without my permission and ask[] me what is in this box . . . are we going to have explosion here today." Uddin Dep. 427; *see also id.* at 543 ("[Feiler] would personally do inspection of my vehicle. . . . He will tell me, What you have in this box? Is there any bomb in this box?"). Feiler also subjected Uddin to questioning "every time he was inside the depot," although "he didn't ask anybody else why [they were] in the depot." Philip Dep. 542–43; *see also* Uddin Dep. 544–45; *id.* at 606–14 (testifying about certain white employees who, unlike Uddin and other minorities, did not have to call in before arriving at the depot).

On September 3, 2013, Uddin's eye was injured by another GTECH employee, Ron Jacobs.[12] JSF ¶ 35. Philip witnessed this incident and took statements from Uddin and Jacobs. *Id.* ¶ 36. Uddin then had a meeting with Feiler and Wyllie regarding the Jacobs incident. *Id.* ¶ 37. Uddin testified that Feiler's presence intimidated him because Feiler "threatened me every time [] not to report anything about him to HR." Uddin Dep. 292. Uddin further testified that he told Wyllie before the meeting that he did not want Feiler present because Feiler threatened him, made comments about explosives while searching his vehicle, and called him "terrorist" and "Taliban." *Id.* at 298.

---

[12] The exact circumstances of this injury are unclear. They are irrelevant to this decision.

Philip testified that, in relation to the Jacobs incident, Feiler complained that "now I have to listen to this towel head," referring to Uddin.  Philip Dep. 310–11.  Philip also testified that, in the same context, Feiler referred to Uddin as a "Taliban."  *Id.* at 540; *see also id.* at 302 (testifying that, at unspecified times, he heard Feiler call Uddin a "terrorist" and a "towel head"); McDonald Dep. 50 (testifying that, on a separate occasion, he heard Feiler call Uddin "a Taliban").

As to comments that Uddin overheard, he testified that he heard Feiler call him a "towel head" "[m]any times."  Uddin Dep. 400.  He also testified that he heard Feiler call him a "terrorist" but "forgot" how many times, *id.* at 404–05, and that, on one occasion, Feiler called him a "Taliban."  *Id.* at 413; *see also id.* at 422 (testifying that Greg Hamilton "called [him] a terrorist").  Finally, Uddin testified that Feiler "would call [him] Bin Laden."  *Id.* at 417.

On May 24, 2014, Uddin sent an email to Dimino complaining that Feiler was being "unfair and racist" toward him, and also that Feiler discriminated against Philip and another FST. JSF ¶ 38.  GTECH assigned Human Resources Director Julie Doti to investigate these allegations.  *Id.* ¶ 39.  Between June 2 and June 6, 2014, Doti interviewed many employees at the Bronx depot.  *Id.* ¶ 40.  On June 19, 2014, Doti advised Uddin that she had completed her investigation and would speak to Feiler regarding his communications with other employees.  *Id.* ¶¶ 41–42.  Feiler was reassigned from the Bronx depot in October 2014, fired in November 2014, and rehired (but not as an FSM) in January 2015.  *Id.* ¶¶ 44–46; Feiler Decl. ¶ 4.

## II.    Legal Standards

After summarizing the familiar standards for resolving summary judgment motions, the Court summarizes the relevant standards for claims of race discrimination, retaliation, and hostile work environment under federal, state, and municipal law.

A.      **Legal Standards:  Summary Judgment**

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court must "construe the evidence in the light most favorable" to plaintiffs, "drawing all reasonable inferences and resolving all ambiguities in their favor."  *CILP Associates, L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 118 (2d Cir. 2013) (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 151 (2d Cir. 2012)).

B.      **Legal Standards:  Plaintiffs' Causes of Action**

Plaintiffs bring claims under federal law (Title VII and Section 1981), the NYSHRL, and the NYCHRL.  The relevant standards overlap substantially, particularly as between federal and state law, but the NYCHRL is generally more favorable to civil-rights plaintiffs.

23

Title VII makes it unlawful for an employer to discriminate on the basis of race, *i.e.*, to use race as a "motivating factor" in taking a materially adverse employment action.  42 U.S.C. § 2000e–2(a), (m).  It also prohibits discrimination against an employee because that employee "has opposed" any such race-based discrimination.  42 U.S.C. § 2000e–3(a).  Section 1981 prohibits racial discrimination in the "enjoyment of all benefits, privileges, terms, and conditions of [a] contractual relationship."  42 U.S.C. § 1981(b).

The substantive analysis under the NYSHRL is the same as under Title VII.  *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

The NYCHRL makes it unlawful "[f]or an employer or an employee or agent thereof, because of the [race] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8–107(1)(a).  The NYCHRL also prohibits retaliation against any person because such person, *inter alia*, "opposed any practice" forbidden by the NYCHRL.  *Id.* § 8–107(7).

For many years, the NYCHRL was interpreted as coextensive with Title VII and the NYSHRL.  *See, e.g.*, *Estate of Hamilton v. City of New York*, 627 F.3d 50, 55 (2d Cir. 2010).  But it is now recognized that the New York City Council's 2005 amendment to the NYCHRL requires courts to undertake an independent analysis of NYCHRL claims.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (discussing Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85).

Therefore, for each of the three types of claims brought in this case, the Court sets forth

the relevant federal/state law and then identifies the ways in which the NYCHRL differs.[13]

### 1.    Race Discrimination

#### a.    Federal/State Law

Federal claims of race-based discrimination are analyzed under the burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell*

*Douglas*, the plaintiff "bears the initial burden of proving by a preponderance of the evidence a

prima facie case of discrimination."  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir.

2014).  To state a prima facie case of race discrimination, a plaintiff must offer evidence that (1)

he belongs to a protected group; (2) he was qualified for his position; (3) his employer took a

materially adverse action against him; and (4) the adverse action occurred under circumstances

giving rise to an inference of race discrimination.  *Kirkland v. Cablevision Sys.*, 760 F.3d 223,

225 (2d Cir. 2014).

If the plaintiff states a prima facie case, it is then "the defendant's burden to proffer a

legitimate non-discriminatory reason for its actions."  *Abrams*, 764 F.3d at 251.  If the defendant

meets this burden, the plaintiff can defeat summary judgment only by proffering evidence of

"circumstances that would be sufficient to permit a rational finder of fact to infer that the

employer's employment decision was more likely than not based in whole or in part on

discrimination."  *Kirkland*, 760 F.3d at 225 (internal quotation marks and alterations omitted).

This burden can be met either by showing that "the employer's stated reason for the adverse

employment action is entirely pretextual, or that the employer had mixed motives, one of which

was the desire to discriminate."  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 n.13 (2d

---

[13] The Court does not exhaustively catalog here all possible distinctions between federal/state
law and the NYCHRL, but focuses on distinctions that are relevant in this case.

Cir. 2015) (internal quotation marks omitted).  Thus, to avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks omitted).

> b.      *NYCHRL's Simplified Inquiry*

Claims under the NYCHRL are not analyzed under the elaborate *McDonnell Douglas* framework.  *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 12 (2d Cir. 2013) (summary order); *see also Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (1st Dep't 2011) (on summary judgment, "a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out in the first place").  Rather, as the Second Circuit has explained, "the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."  *Mihalik*, 715 F.3d at 110 n.8.[14]

Thus, on summary judgment, "[t]he employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination played no role' in its actions."  *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 n.27 (1st Dep't 2009)) (alteration omitted).  To prevail on a summary judgment motion under the NYCHRL, the employer is "required to meet its burden of showing that, based on the evidence before the court and drawing all reasonable inferences in [plaintiff's] favor, no

---

[14] Consistent with the more protective "treated less well" standard, the NYCHRL does not require that the allegedly discriminatory adverse action was "material."  *See Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 12 n.3 (2d Cir. 2013) (summary order).

jury could find that the [defendant] treated [the plaintiff] 'less well' than other employees at least in part because of her race." *Simmons*, 508 F. App'x at 13.

Still, the causation inquiry prescribed by the NYCHRL "closely mirrors the questions that courts must answer when resolving summary judgment motions on Title VII claims." *Chen*, 805 F.3d at 76 n.13. For instance, there is no basis to distinguish the "played no role" formulation used in some NYCHRL cases from the formulation of the causation standard (a "motivating factor") used under federal law. Indeed, several cases have used "played no role" interchangeably with "motivating factor." *See Carryl v. MacKay Shields, LLC*, 941 N.Y.S.2d 116, 117 (1st Dep't 2012); *Bennett*, 936 N.Y.S.2d at 120; *Williams*, 872 N.Y.S.2d at 40 n.27. In the Court's view, the statutory standards as to causation are coterminous: If a plaintiff demonstrates that discrimination was a motivating factor for an adverse employment action, he negates the notion that discrimination played "no role"; if, however an employer demonstrates that discrimination played no role, the plaintiff has not satisfied his burden of proving it was a motivating factor.

### 2.   Retaliation

#### a.   *Federal/State Law*

Title VII retaliation claims are also subject to the *McDonnell Douglas* framework. *Kirkland*, 760 F.3d at 225. To state a prima facie case of retaliation, a plaintiff must establish that: (1) he participated in a protected activity; (2) his protected activity was known to the employer; (3) the employer thereafter subjected him to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

If the plaintiff states a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. If the employer meets this burden,

a plaintiff can survive summary judgment only if admissible evidence permits a rational

factfinder to conclude "that the unlawful retaliation would not have occurred in the absence of

the alleged wrongful action or actions of the employer." *Kirkland*, 760 F.3d at 225 (quoting

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims

must be proved according to traditional principles of but-for causation," not the "motivating

factor" test applicable to status-based employment discrimination)).

b.      *NYCHRL: Lower Standard of Causation*

Under the NYCHRL, a plaintiff need establish only that his protected activity was a

motivating factor behind the defendant's retaliatory action—not, as under Title VII, that it was a

but-for cause. *See Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013)

(citing *Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 792 (2d Dep't 2013)).[15]

3.      **Hostile Work Environment**

a.      *Federal/State Law*

A federal claim of hostile work environment against an employer requires the plaintiff to

show "that the discriminatory harassment was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment," that "the

hostile conduct occurred because of a protected characteristic," and that "a specific basis exists

for imputing the objectionable conduct to the employer." *Tolbert*, 790 F.3d at 439 (internal

quotation marks omitted).  Courts consider "the totality of the circumstances, including: the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the

---

[15] Also, the NYCHRL's definition of protected activity has been broadly construed, *see Mihalik*, 715 F.3d at 112 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011)), and the NYCHRL prohibits an "even broader" range of adverse retaliatory actions relative to federal and state law.  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 534 (S.D.N.Y. 2015); *see also Williams*, 872 N.Y.S.2d at 34 n.12 (NYCHRL "specifically rejects a materiality requirement").

28

victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (alteration and internal quotation marks omitted). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). But "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*

Generally, an employer is vicariously liable for the unlawful conduct of a supervisor, *i.e.*, an employee who is "empowered . . . to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). When no tangible employment action is involved, however, the employer may avoid liability by establishing the two-part *"Faragher–Ellerth"* defense: that (1) "the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (addressing sex-based harassment); *see also Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir. 1997) (standards are the same for sex-based and race-based harassment).

### b. NYCHRL: Broader Definition of Actionable Harassment

By contrast, the NYCHRL does not require severe or pervasive conduct for a plaintiff to prevail on a hostile work environment claim. *Mihalik*, 715 F.3d at 114. To be sure, as under federal law, a "petty slight" or "trivial inconvenience" is not actionable, and the harassment must relate to a protected characteristic. *See id.* at 110 ("It is not enough that a plaintiff has an

overbearing or obnoxious boss.").  There is, however, a "broad range of conduct" that falls

between the federal standard ("severe or pervasive") and "a petty slight or trivial inconvenience."

*Williams*, 872 N.Y.S.2d at 41.  Moreover, under the NYCHRL, a defendant's claim that the

harassing conduct was a "petty slight or trivial inconvenience" is an affirmative defense.  *Id.*

Therefore, summary judgment is available only when the employer "can prove that the alleged

discriminatory conduct in question does not represent a 'borderline' situation but one that could

only be reasonably interpreted by a trier of fact as representing no more than petty slights or

trivial inconveniences."  *Id.*; *see also Mihalik*, 715 F.3d at 114.

> c.      *NYCHRL: Strict Vicarious Liability and Unavailability of the* Faragher–Ellerth *Defense*

Under the NYCHRL, employers are strictly vicariously liable for the discriminatory acts

of employees exercising "managerial or supervisory responsibility," even if the discrimination

did not result in a tangible employment action.  N.Y.C. Admin. Code § 8–107(13)(b)(1).  The

New York Court of Appeals has held that the *Faragher–Ellerth* defense is unavailable for claims

under the NYCHRL of sex-based harassment by a manager or supervisor.  *See Zakrzewska v.*

*New Sch.*, 14 N.Y.3d 469, 475 (2010).  There is no basis for treating race-based hostile work

environment claims differently.  *See Armstrong v. MTA*, No. 07 Civ. 3561 (DAB), 2015 WL

992737, at *6 (S.D.N.Y. Mar. 3, 2015); *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF),

2012 WL 6720919, at *23 (S.D.N.Y. Dec. 18, 2012).  Thus, where a supervisor is shown to have

engaged in race-based harassment constituting a hostile work environment, the employer's anti-

discrimination policies and affirmative anti-discrimination steps are relevant only to damages,

not liability.  *See Zakrzewska*, 14 N.Y.3d at 480.

4.        **Individual Liability**

Federal, state, and municipal law differ in how they treat employees and supervisors who engage in prohibited conduct.

Under Title VII, individuals may not be held personally liable. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–14 (2d Cir. 1995).  However, individuals may be liable under Section 1981 if they were personally involved in race-based discrimination, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000), and if such discrimination was intentional, *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004); *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014) (similar substantive standards apply to Section 1981 and Title VII claims).  Section 1981 also reaches race-based retaliation, *see Littlejohn v. City of New York*, 795 F.3d 297, 324 n.14 (2d Cir. 2015), and hostile work environment claims, *see Whidbee*, 223 F.3d at 69.

Under the NYSHRL, a manager or supervisor may be individually liable for participating in discriminatory conduct if he has "power to do more than carry out personnel decisions made by others." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (internal quotation marks omitted).[16]

Individual liability under the NYCHRL extends further:  Municipal law prohibits employment-related discrimination by any "employee or agent" of the employer.  N.Y.C. Admin. Code § 8–107(1)(a); *see also Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) ("Individual employees may also be held liable under the NYCHRL if they participated in the conduct giving rise to the discrimination claim.").

---

[16] If the relevant actor lacks such authority, individual liability is also available under an aiding-and-abetting theory.  *See Tolbert*, 790 F.3d at 434 n.3.

31

III.    **Discussion**

The Court analyzes each plaintiff's claims separately.  As to each, the Court first applies federal law.  The Court addresses the more plaintiff-friendly NYCHRL only if it concludes that summary judgment should be granted for defendants on the parallel federal claim.

A.      **Philip**

Philip brings three claims—race discrimination, retaliation, and hostile work environment—under federal, state, and municipal law.  The parties' positions as to these claims are briefly summarized.

Philip, who is African-American, was an FSS working under Feiler in the Bronx depot for about eight months—between July 2013 and March 2014.  He claims that Feiler used racial slurs ("nigger" and "monkey") in his presence and/or in reference to him and other African-American employees.  Philip claims that these slurs, combined with Feiler's generally harsh and unfair treatment, created a racially hostile work environment.  He further claims that, not long after he complained to Wyllie about Feiler's conduct, Feiler discriminatorily placed him on an unjustified and unrealistic Performance Improvement Plan, and that his purported failure to meet the expectations set forth therein was a pretext for firing him based on his race and in retaliation for his complaints.

Defendants counter that Philip was a slow learner who was ill-suited for the FSS position.  They claim that Feiler was not a racist and that his workplace actions were not motivated by racial views; rather, he was a difficult supervisor who harshly treated, micromanaged, and criticized employees on a race-neutral basis.  And, defendants argue, Philip's complaints to Wyllie about Feiler were of general (not race-based) mistreatment, and thus were not protected activity under the civil-rights laws.  Finally, defendants argue, Philip was justifiably terminated, after months of unsatisfactory performance, negligible improvement, and progressive discipline,

32

and his termination was decided not just by Feiler, who had hired him eight months earlier, but also by supervisors whose motives Philip does not impugn.

### 1.    Discrimination Claim

#### a.    Prima Facie Case

The four elements of a prima facie case of race discrimination are (1) protected status, (2) qualification for the position, (3) materially adverse employment action, and (4) circumstances giving rise to an inference of race discrimination.  The first three elements are undisputedly satisfied:  Philip is African-American, was qualified for the Field Service Supervisor position, and was fired from that position (the paradigmatic adverse employment action).

As to the fourth element, the Court holds, a reasonable jury could find circumstances giving rise to an inference of discrimination.  Comments reflective of racial bias—particularly when uttered by a supervisor with significant responsibility for hiring and firing—can supply substantial evidence of discriminatory intent.  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.").

The Second Circuit's recent decision in *Tolbert*, 790 F.3d 427, is illustrative.  There, the Circuit held that the plaintiff—a culinary arts teacher—had made out a prima facie case of racial discrimination based on three race-related comments by the school's principal (*e.g.*, "Do you only know how to cook black, or can you cook American too?"), uttered months before the alleged adverse action.  The Circuit observed that employers "are unlikely to leave a 'smoking gun' admitting a discriminatory motive."  *Id.* at 438.  Therefore, statements "showing an employer's racial bias" adequately support a prima facie case of discrimination.  *Id.*

Here, although defendants label Feiler's conduct as just "two stray remarks," Def. Philip Br. 2, there is evidence that Feiler made several comments directly probative of racial bias—arguably more so than the comments at issue in *Tolbert*. There is evidence of at least three occasions where Feiler used the most hateful racial epithet to refer to his African-American employees, including one where he specifically referred and spoke to Philip. *See* Philip Dep. 275 ("They're acting like they've never seen any niggers in here."); *id.* at 279 ("[M]onkeys can be trained to do this faster than these niggers."); Uddin Dep. 99 ("I cannot deal with these niggers."). It is significant, too, that some of these remarks reflect a negative view on the ability and performance of African-American employees. *See Tolbert*, 790 F.3d at 437 ("[T]wo of the comments were about Tolbert's qualifications as a teacher."). There is also testimony that Feiler's practice was to mutter this slur under his breath while speaking to or about Philip, *see* Philip Dep. 556–61, and that he used this term in the workplace "many times." Uddin Dep. 120. Further, there is testimony that Feiler used the term "monkey" frequently, *see* Philip Dep. 557–58, including one instance where he told Philip that "a monkey could do" what Philip was doing. *Id.* at 558. Finally, there is evidence that Feiler used derogatory slurs about Uddin, a Muslim born in Bangladesh. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (although slurs about other minority groups "may be of limited probative value," they "cannot be ignored" on summary judgment); *Cruz*, 202 F.3d at 570.

These remarks, if credited, would be sufficient for a reasonable jury to conclude that Feiler harbored racial bias towards African-Americans at the time he decided to fire Philip. While some of Feiler's alleged comments were directed at the FSTs, not at Philip, the term "nigger," in particular, is so beyond the pale that its repeated use as an insult in reference to African-American employees clearly can support an inference of discrimination as to Philip.

34

Defendants make several arguments attempting to undermine this prima facie case. None is persuasive.

*First*: Defendants minimize Feiler's comments, construing them in the most benign light. They argue that Feiler's comment in the restaurant ("They're acting like they've never seen any niggers in here.") was "derisive" of "the prejudices that [Feiler] believes these diners possess," and that his references to "monkeys" were race-neutral. *See* Def. Philip Br. 20–21. Perhaps a reasonable jury might so find. But a reasonable jury could easily find otherwise. And on summary judgment, it is not for the Court—which can make neither credibility determinations nor nuanced assessments of tone and implication—to reach such conclusions itself. The Court instead must construe the evidence in the light most favorable to non-movant Philip. Notably, the restaurant incident is not the only occasion where Feiler allegedly used the term "nigger," and there are comments in the record ("[M]onkeys can be trained to do this faster than these niggers") that link his use of the term "monkey" to African-Americans. *See Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 21 N.Y.S.3d 221, 228–29 (1st Dep't 2015) ("While some language is unmistakably reflective of the presence of race or other protected class status in the mind of the speaker, in many other cases meaning is context-dependent.").

*Second*: Defendants invoke the "same actor inference," which holds that, when a decisionmaker within a short period of time both hires and fires a member of a protected class, "it is difficult to impute . . . an invidious motivation." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *see* Def. Philip Br. 11. For two reasons, that inference does not avail defendants. First, the inference is not dispositive where others—notably, the inference of discrimination that can be drawn from racist slurs—strongly cut the other way. *See Grady*, 130 F.3d at 560 ("[E]ach case

must involve an examination of all the circumstances."); *Bookman v. Merrill Lynch*, No. 02 Civ. 1108 (RJS), 2009 WL 1360673, at *14 (S.D.N.Y. May 14, 2009); *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999).  Second, there is evidence that Feiler was not the ultimate decisionmaker with respect to Philip's hiring (although it is undisputed that he recommended Philip and played a significant role in his hiring).  *See* Pl. 56.1, ¶¶ 41–44.  These considerations substantially vitiate the same actor inference.

*Third*:  Defendants argue that Feiler's decision to fire Philip was essentially a group decision, with which several presumptively nondiscriminatory GTECH managers agreed.  *See* Def. Philip Br. 11–12.  However, although Wyllie testified that she and Feiler jointly decided to terminate Philip's employment, *see* Wyllie Dep. 337–38, Feiler himself testified that *he* made the decision and merely "consult[ed]" with others.  Feiler Dep. 456; *see also* Feiler Decl. ¶ 16.  A jury could credit him on that.  Thus, it is effectively uncontested that Feiler "played a meaningful role" in the decision to fire Philip—which is all that Philip must show—and there is substantial evidence that Feiler was the "ultimate decision maker."  *Tolbert*, 790 F.3d at 434 n.4.

The Court's decision in *Daniel v. T & M Protection Resources LLC*, 87 F. Supp. 3d 621 (S.D.N.Y. 2015), on which defendants rely, is not to the contrary.  *See* Def. Philip Br. 12.  In *Daniel*, the decision to terminate plaintiff Daniel "was made unanimously by a five-member disciplinary committee comprised of [the alleged discriminator] and four others," and approved by the company's CEO.  87 F. Supp. 3d at 643.  And the "key facts" on which the committee relied were "established by evidence (including the testimony of Daniel himself)" besides the say-so of the alleged discriminator.  *Id.* at 644.  Here, by contrast, there is evidence that Wyllie largely took, at face value, Feiler's claims about Philip's purportedly deficient job performance.  *See* Wyllie Dep. 244, 353–54, 360–61.

*Fourth*:  Defendants argue that Feiler treated *everyone* poorly, white and black.  *See* Def. Philip Br. 12.  A reasonable jury might find that Feiler was indeed an all-purpose misanthrope. But it could also find otherwise, particularly if it credited the testimony about his use of racial slurs, or the testimony that Feiler treated African-American employees, especially Philip, worse than white employees.  *See, e.g.*, Philip Dep. 237–43, 600–02; Uddin Dep. 99–100, 110–15; Doti Decl., Ex. U; *id.*, Ex. N.

*Fifth*:  Defendants argue that Feiler's race-based comments were too distant in time from the decision to fire Philip, negating the inference that that decision was infected by racial bias. *See* Def. Philip Br. 13–14.  The two comments on which defendants seize occurred some four months before Philip's firing.  *See id.*  But there is testimony, reviewed above, that Feiler made more racist comments and that these spanned a broader period.[17]  And, in any event, the Second Circuit has held that comparably remote comments can support an inference of discrimination. *See Tolbert*, 790 F.3d at 437 (comments made in "the fall" were cognizable as to adverse action in April).

For these reasons, Philip has established a prima facie case of race discrimination as to his March 2014 firing from GTECH.

### b.     *Nondiscriminatory Reason and Pretext*

The burden thus shifts to defendants to proffer a legitimate, nondiscriminatory reason for Philip's termination.  As noted, defendants maintain, and have adduced evidence, that Philip's

---

[17] By contrast, in the two cases on which defendants rely, the allegedly discriminatory remarks were isolated, not to mention comparatively innocuous.  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012) (reference to plaintiff's limitations as "a mental thing" and description of her behavior as "erratic" could not support inference of disability-related intent); *Sheridan v. N.Y. Life Inv. Mgmt., LLC*, No. 09 Civ. 4746 (KBF), 2012 WL 474035, at *7 (S.D.N.Y. Feb. 9, 2012) ("single stray comment" that "younger guys" might want an opportunity could not support inference of age-discriminatory intent).

job performance was subpar.  This is a legitimate, nondiscriminatory reason.  *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

The burden therefore shifts back to plaintiff to prove either that this justification is wholly pretextual or that, even if it played some role, race was at least a motivating factor behind Philip's termination.  *See Holcomb*, 521 F.3d at 142 (plaintiffs are "not *required* to prove that the employer's stated reason was a pretext," but "may establish that the 'impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation'") (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilitie*s, 115 F.3d 116, 120 (2d Cir. 1997)) (emphasis in original).

Construing the record in the light most favorable to Philip, there are triable issues of fact which, if resolved in Philip's favor, would enable a reasonable jury to find that race was more likely than not a motivating factor in his termination.  In particular:

*First*:  The Progress Update faulted Philip on the ground that "there has been no communication initiated by [Philip] on [his] day-to-day activities."  But the PIP does not contain a requirement to this effect.  Similarly, the Progress Update faulted Philip for updating Feiler about "FST/Customer activities" only when he "was brought into [Feiler's] office," but the PIP merely required that such reviews "happen daily."  Feiler conceded in his deposition testimony that the expectation that Philip should initiate such communications with him may never have been conveyed to Philip.  *See* Feiler Dep. 474 ("[T]he assumption was made.").  And, contrary to the Progress Report's claim of inadequate communications, Philip testified that he "had to communicate" with Feiler—"even if [he] didn't want to"—because Feiler "would knock on my wall and call me in his office every day."  Philip Dep. 252.

38

*Second*:  The PIP stated that Philip was to "[d]ocument [his] work activities every 30 minutes for 5 working days"; it added, perhaps confusingly in light of this directive, that the list was due "every morning."  The Progress Update later faulted Philip for "provid[ing] [Feiler] with 4 daily activity lists which were late and only received upon request," while acknowledging that, on February 28, 2014, Philip provided Wyllie with "7 updates out of a 20 day work schedule."  That Philip failed to comply with the PIP's less than pellucid directives is not a foregone conclusion.  *See* Wyllie Dep. 360 (denying that Philip should have provided more than seven updates).  Adding confusion, Feiler testified that Philip "was asked to document his daily activities *in the 60 days* leading up to his termination," Feiler Dep. 455–56 (emphasis added), while testifying that Philip was *not* expected, contrary to the implication of the Progress Update, to provide daily updates for a 20-day work schedule.  *Id.* at 481.  Indeed, Feiler testified that he "didn't put much thought" into whether it was appropriate for Philip to provide only seven updates; Feiler focused on the fact that "he didn't openly come out and try to give them to me early on in the PIP."  *Id.* at 482; *see also* Wyllie Dep. 242 ("[Feiler] told me [Philip] never approached him.").  On this record, Philip's obligations are far from clear, and his failure to meet them is, at a minimum, open to debate.

*Third*:  The PIP required Philip to access "FST reports" daily and to review them for "inconsistencies in FST performance."  The Progress Update's corresponding entry, however, faulted Philip for not "discuss[ing] any inconsistencies or issues with FST performance with [Feiler]."  Thus, whereas the PIP focused on tasks Philip was to perform, the Progress Update focused, again, on his perceived lack of communication.  The record appears devoid of evidence as to whether, in the short period (under six weeks) between the PIP and the Progress Update,

Philip actually *encountered* any "inconsistencies or issues with FST performance" and then failed to discuss them with Feiler.

*Fourth*:  The PIP required Philip to develop, within two weeks, an equipment checklist and a "training document (checklist) for all New Hires."  The Progress Update faulted Philip for "not submit[ting] any documentation to [Feiler]," but acknowledged that Philip had provided both checklists to Wyllie.  The Progress Update also added that Philip had not "develop[ed] an FST-specific training," but the PIP did not require any such thing.  *See* Wyllie Dep. 370.  And Feiler, for his part, testified that he did not ask Philip for the equipment checklist, but instead was "waiting to see" what Philip would do.  Feiler Dep. 486.

*Fifth*:  The PIP mandated that Philip "[r]eview progress of all new hires weekly."  The PIP did not state whether this "review" process was to be performed by Philip alone, or collaboratively with Feiler.  The Progress Update made a critical (and ungrammatical) revision that implied the latter:  "Review progress of all new hires *with [Feiler]* weekly which [Philip] has not provided update to [Feiler]."  A reasonable jury could find that the Progress Update had imposed, retroactively, a requirement on Philip to meet with Feiler weekly to discuss new hires—and then faulted him for not doing so.  *See* Wyllie Dep. 371 (acknowledging Philip may not have been "informed" he was supposed to meet with Feiler weekly to discuss new hires).

*Sixth*:  The Progress Update faulted Philip for failing to complete certain online training courses.  It acknowledged that Philip reported to Wyllie that he had been unable to register for these classes, but stated that he should have discussed these difficulties with Feiler or asked others for assistance.  Feiler testified that he "would have liked" Philip to "come talk to me," criticizing him for failing to "initiate anything back towards me on a couple of training courses." Feiler Dep. 478–79.  But Feiler also testified that, although he was aware that Philip and Wyllie

discussed Philip's inability to register for the classes, he (Feiler) did not follow up to assist Philip, but was "waiting to see" what Philip would do.  *Id.* at 478.

*Seventh*:  There is a triable issue of fact about the timeframe in which Philip's performance relative to the PIP would be evaluated.  The PIP contains a "Results" column that indicates that the employee's performance would be re-evaluated after 30, 60, and 90 days.  *See also* Feiler Dep. 307.  And Feiler testified that he told Philip that he had *60 days* to satisfy the PIP's requirements.  *Id.* at 305.  However, the Progress Update was written only 39 days after the PIP had issued (March 7, 2014)—notably, just one week after Philip aired additional complaints about Feiler to Wyllie—and Philip was fired 10 days later.  *See Tolbert*, 790 F.3d at 438 ("Departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.") (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)).

Thus, there is both evidence of discrepancies between the expectations conveyed in the PIP and the faults identified in the Progress Update, and evidence that some expectations simply were never conveyed to Philip.  "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Significantly, too, there is evidence that Philip's principal shortcoming, in Feiler's eyes, was a perceived reticence to initiate conversations with Feiler.  *See* Feiler Dep. 466 (testifying that Philip "was just avoiding" Feiler).  A reasonable jury could conclude that Philip withdrew from Feiler on account of Feiler's racial slurs, and was then fired for being too withdrawn.  *See* Philip Aff. ¶ 18 (testifying that he did not ask Feiler for help "because he had continually discriminated against me").  A jury could find that a supervisor who used "nigger" to refer to

41

African-American subordinates could not realistically expect such a subordinate to readily

initiate the myriad conversations that that supervisor claims to have expected.[18]

Finally, looking holistically at Philip's tenure at GTECH, there is evidence on which a

jury could find that Feiler interfered with Philip's ability to do his job—assigning Philip's

responsibilities to Philip's subordinates, informing Philip of meetings with too little time to

prepare, and giving him extra work. *See* Uddin Dep. 82, 110–15, 308–309; Philip Dep. 600–02.

About four months into Philip's tenure, around the time that Philip claims to have first

complained about Feiler's racial slurs, Feiler faulted Philip's entry of certain timecards (although

Feiler concedes that Philip himself caught one of the two errors and blamed Feiler for the other).

*See* Feiler Dep. 278–79.  On December 16, 2013, Feiler issued Philip a Corrective Action for this

error, and stated that Philip would be issued a Performance Improvement Plan.  *See* Pearson

Decl., Ex. 23.  Feiler then took "[a] week [or] two weeks" to draft the PIP, *see* Feiler Dep. 302,

which, the evidence suggests, he began drafting in late December or early January.[19]  The PIP

then required Philip to produce—within two weeks—three checklists, a "depot process

document," an action plan for low-performing FSTs, and at least five daily activity lists.  It also

---

[18] Even if Feiler were found to have genuinely expected such communications from Philip and to
have acted in good faith in faulting Philip for his reticence, an employer's "good faith" does not
necessarily preclude a discrimination claim.  Rather, as the Second Circuit has explained, a
decisionmaker may be "unaware of his own discriminatory motivation and may believe in good
faith that his different explanation honestly accounts for the decision, without awareness of the
extent to which his judgments are influenced by ingrained discriminatory attitudes which have
been proved to the jury."  *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 n.6 (2d Cir. 2010).
Whether the facts here prove such "ingrained discriminatory attitudes" is a matter for the jury.

[19] Several different versions of the PIP—some signed, some unsigned—are in the record.  One
unsigned version contains two pages that do not appear in other versions.  *See* Pearson Decl., Ex.
27.  Wyllie testified that she did not "recognize" these two pages.  Wyllie Dep. 238.  These two
pages refer to January 10, 2014 deadlines for much the same assignments/tasks that appear in
other versions of the PIP, which was ultimately issued on January 27.  From this, it could be
inferred that portions of the PIP were drafted as early as the end of December.

imposed certain requirements on Philip *sub silentio* and/or retroactively.  The jury could conclude that these burdens were unreasonably imposed, and that Feiler's finding that Philip's performance was deficient was pretextual.  *See* Doti Decl., Ex. L (Dimino telling GTECH investigator, "It seems like [Feiler] built up a case to get rid of [Philip].").  The jury could infer—including on the basis of Feiler's slurs—that racial considerations were a motivating factor for Philip's firing.

Defendants vigorously counter these inferences.  They argue that even if reasonable minds could differ about whether Philip's performance was lackluster, their decision to terminate Philip was made for racially neutral reasons.  *See* Def. Philip Reply 5.  And, if so, they note, no claim can lie, for the Court's and the jury's role is not to assess the wisdom of GTECH's employment decisions.  *See Ghent v. Moore*, 324 F. App'x 55, 57 (2d Cir. 2009) (summary order) (court is not to "sit as a super-personnel department to reexamine whether an employee's performance was really deficient") (quoting *Stern v. Trustees of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 315 (2d Cir. 1997)).  Here, a jury could indeed credit defendants' view of the facts, and find that the decision to terminate Philip was uncorrupted by any racial bias.  But that is a jury decision.  The record evidence here goes well beyond mere disputes about whether Philip's performance was actually subpar.  There is ample evidence on which a jury could infer that Feiler—and by extension GTECH—was not merely *wrong* about Philip's performance, but, motivated at least in part by race, "set him up for failure."  *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10 Civ. 5612 (SJF), 2012 WL 3646935, at *15 (E.D.N.Y. Aug. 22, 2012).

For these reasons, a jury, not the Court, must resolve Philip's discrimination claims. Defendants' motion for summary judgment on these claims is, therefore, denied.[20]

### 2.    Retaliation Claim

Philip separately claims that defendants retaliated against him for complaining about Feiler's racist remarks.

#### a.    *Prima Facie Case*

The four elements of a prima facie case of retaliation are: (1) participation in a protected activity; (2) the employer's awareness of that activity; (3) a materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.

As to protected activity:  Philip testified that he told Wyllie in late November or early December 2013 about two of Feiler's remarks about "niggers."  *See* Philip Dep. 274, 277–83. Philip further testified that, in late February 2014, he told Wyllie about Feiler's "racist remarks," including "comparing technicians to niggers and monkeys," but left these out of his written complaint because he did not trust Wyllie or want a record of the full nature of his complaint.  *Id.* at 268, 296.  These complaints constitute protected activity.  In so holding, the Court need not decide whether the February 2014 *written* complaint, standing alone, would constitute protected activity by virtue of its general references to "discrimination," "hostile work environment," and "harassment."  *See* Def. Philip Br. 18 ("Philip's memo to Wyllie did not mention any concerns about alleged racist remarks or conduct by Feiler.").  That is because Philip testified—and on defendants' motion for summary judgment this testimony must be credited—that he orally

---

[20] Given the Court's analysis of Philip's discrimination claim under federal standards, it follows, as to Philip's NYCHRL claim, that there is sufficient evidence on which a reasonable jury could find that Philip was treated less well because of his race.  *See Simmons*, 508 F. App'x at 14; *Bennett*, 936 N.Y.S.2d at 123.

elaborated on these complaints and notified Wyllie of the racial component of Feiler's alleged misconduct.

As to awareness:  Defendants maintain that there is "no evidence that Feiler ever knew about [the] 2013 complaint."  *Id.*  That is wrong.  Feiler testified that he "found out during all this after the fact that [Philip] went to [Wyllie] with some allegations," specifically that Feiler used the term "nigger" around Philip.  Feiler Dep. 493.  Asked who told him that Philip made such an allegation, Feiler responded:  "Discussing it with [Wyllie] afterwards."  *Id.*  To be sure, Feiler sought to retract this testimony, stating, "I didn't have the conversation with Ms. Wyllie."  *Id.* at 494.  But a jury could discredit that retraction.  While less than perfectly clear, Feiler's testimony provides grounds on which a reasonable jury could infer that Wyllie made Feiler aware of Philip's 2013 complaint sometime before he decided to fire Philip.  Corroborating that conclusion, Philip testified that Wyllie told him that she had relayed this complaint to Feiler.  *See* Philip Dep. 548–49.[21]

As to adverse action and causal connection:  Philip made his first complaint at most four months before defendants took the paradigmatic adverse action against him—termination.  For purposes of establishing causal connection in a prima facie case, this is not too attenuated.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Furthermore, even if Feiler *were* found ignorant of Philip's complaints, Wyllie's own awareness of them could establish a prima facie case—provided that the jury credited Wyllie's

---

[21] Defendants object that this is inadmissible hearsay.  *See* Def. Philip Reply 9 n.4.  For the purpose of this motion, without prejudice to defendants' right to more fulsomely litigate this evidentiary issue at trial, the Court holds otherwise.  This testimony is prima facie admissible under Federal Rule of Evidence 801(d)(2)(D), governing statements "made by [a] party's agent or employee on a matter within the scope of that relationship and while it existed."  Wyllie was employed by GTECH and acting within the scope of her employment when she allegedly told Philip that she had conveyed his complaint to Feiler.

testimony that she jointly decided, with Feiler, to fire Philip. *See* Wyllie Dep. 337–38. There is evidence that Philip was fired mere weeks after complaining to Wyllie for the second time about Feiler's racist comments—close enough in time to support the inference of a causal connection. *See Zann Kwan*, 737 F.3d at 845 (three-week period). Of course, a reasonable jury, crediting Feiler, could find that he acted more or less autonomously in firing Philip. But the Court cannot resolve such conflicting evidence on summary judgment. There is sufficient evidence on which the jury could find for Philip on this point.

      Therefore, Philip has made out a prima facie case of retaliation.

*b.*    *Nondiscriminatory Reason and Pretext*

      The pretext analysis for Philip's retaliation claim mirrors that for his discrimination claim. The only difference is that, as to his federal retaliation claim, Philip bears the burden of producing sufficient evidence for the jury to conclude that he would not have been fired *but for* his protected activity. *See Nassar*, 133 S. Ct. at 2533. This standard of causation does not, however, require Philip to show that retaliation was "the only cause" of his firing. *Zann Kwan*, 737 F.3d at 846. An event as significant as an employee's termination can certainly have multiple but-for causes. *See id.* at 846 n.5.

      Decisive here, each of Philip's claimed complaints was quickly followed by an adverse action.[22] This sequence, considered in combination with the evidence of pretext reviewed above in connection with the discrimination claim, would give a reasonable jury a sufficient basis on which to conclude that Philip's protected activity was a but-for cause of his termination.[23]

---

[22] The Court has no occasion to decide whether GTECH's December 16, 2013 Corrective Action was "materially" adverse to Philip.

[23] It follows that there is sufficient evidence on which a jury could find that Philip's protected activity was a motivating factor behind his termination, so as to satisfy the lower standard of causation set by the NYCHRL. *See Russo*, 972 F. Supp. 2d at 456.

46

### 3.      Hostile Work Environment Claim

A hostile work environment claim requires a plaintiff to show that (1) "the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," (2) "the hostile conduct occurred because of a protected characteristic," and (3) "a specific basis exists for imputing the objectionable conduct to the employer." *Tolbert*, 790 F.3d at 439 (internal quotation marks omitted). The plaintiff must also (4) "subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374.

The evidence of overtly racist utterances by Philip's direct supervisor, Feiler, clearly suffices to establish the second and third elements. As to severity and pervasiveness, defendants argue that "Feiler made a total of two comments that [Philip] claims created a hostile work environment." Def. Philip Br. 20. That misstates the record. As noted, there is evidence that Feiler's use of racial slurs was more frequent and varied. And, contrary to defendants' claim, a jury that found that Feiler had made comments in the workplace referring to "niggers" and "monkeys" could easily find him to have made those comments with "racist undertones." *See id.* at 21.

Moreover, there is evidence of comments specifically directed at Philip himself, as well as comments about other African-American employees and about Uddin. All these comments may be considered in evaluating the objective abusiveness of Philip's work environment. *See Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007); *Leibowitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001); *Cruz*, 202 F.3d at 570. And as to the fourth element, relating to Philip's subjective sense of abusiveness, his repeated complaints supply a clear basis on which a jury could find that he perceived his work environment as hostile.

Construing this evidence in the light most favorable to Philip, a reasonable jury could conclude that Feiler's harassment was sufficiently severe or pervasive to create a hostile work environment.[24]

**B.     Woodley**

Woodley brings two claims: for race discrimination and for hostile work environment. The Court briefly recaps both sides' contentions.

Woodley, who is African-American, was a longtime FST at GTECH.  During the relevant period, Woodley worked out of the Queens/Bronx depot that Feiler managed; his work zone was Manhattan.  Woodley claims to have heard Feiler use the term "lazy nigger" in reference to another African-American FST, and to have heard about other slurs.  Woodley claims that these slurs evidence Feiler's race-based motivation for firing him in September 2013, under the pretext that Woodley had been "stealing time" from GTECH by tampering with the GPS on his phone and remaining at home in Queens when he was supposed to be in his work zone in Manhattan. He also claims that these slurs created a racially hostile work environment.

Defendants argue that Woodley's theft of time was gross misconduct that justified his immediate termination.  Defendants maintain that the GTECH personnel who reviewed Woodley's GPS reports reasonably concluded that he was shirking his work responsibilities, and that Woodley's explanations when confronted with this evidence were conflicting.  Thus, they argue, Woodley's termination was entirely unconnected to discrimination.

---

[24] As to Philip's NYCHRL claim, a reasonable jury could reject the affirmative defense that Philip was subjected to "no more than petty slights or trivial inconveniences."  *Williams*, 872 N.Y.S.2d at 41.

### 1.       Discrimination Claim

####         a.       Under Federal and State Law

Again, the four elements of a prima facie case of discrimination are (1) protected status,

(2) qualification for the position, (3) materially adverse employment action, and (4)

circumstances giving rise to an inference of race discrimination.

Defendants challenge the evidence as to the last element.  They argue that Woodley has

adduced no evidence that his firing occurred under circumstances giving rise to an inference of

discrimination because he "cannot cite to a single example of a similarly situated White

employee who was caught stealing time after being repeatedly warned, but was not terminated."

Def. Woodley Br. 12.  That argument, however, is not dispositive, because comparative evidence

is not required for a plaintiff to state a prima facie case.  *See Back v. Hastings On Hudson Union*

*Free Sch. Dist.*, 365 F.3d 107, 121 (2d Cir. 2004).  In the cases on which defendants rely, courts

merely noted that comparative evidence was absent; they did not hold that it was a necessary

ingredient of a discrimination claim.  *See Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F.

App'x 88, 93 (2d Cir. 2014) (summary order); *Muhammad v. Walmart Stores E., L.P.*, 532 F.

App'x 21, 22 (2d Cir. 2013) (summary order); *Vasconcellos v. Mount Sinai Med. Ctr.*, No. 05

Civ. 10479 (GBD) (HBP), 2011 WL 1097415, at *18 (S.D.N.Y. Feb. 16, 2011), *report and*

*recommendation adopted*, 2011 WL 1046055 (S.D.N.Y. Mar. 22, 2011).

Defendants separately argue that "Woodley cannot impute discriminatory motives to the

other individuals involved in the decision to fire him."  Def. Woodley Br. 12.  That is true, but it

is not conclusive as to whether Woodley has made out a prima facie case, because as with Philip,

there is evidence that Feiler was the driving force behind Woodley's firing.  *See Tolbert*, 790

F.3d at 434 n.4 (alleged discriminator must have "played a meaningful role" in the decision).

Wyllie, for example, testified that, while she and Feiler made the termination decision together,

*see* Wyllie Dep. 318–19, the first time she had a conversation about Woodley was in August 2013 "when Mike Feiler had reason to believe that [Woodley] was not reporting to work in his work zone when he [was] supposed to." *Id.* at 164. Viewing this evidence in the light most favorable to Woodley, a reasonable jury could conclude that Feiler played a meaningful role in the firing decision, because he was the one who initially concluded in August 2013, after the ride-along, that Woodley had been stealing time and tampering with his GPS. And, as reviewed earlier, there is significant evidence of Feiler's use of racial epithets towards Woodley's racial group. The evidence of a key decisionmaker's racial bias is therefore sufficient to establish Woodley's prima facie case. *See Tomassi*, 478 F.3d at 115.

The burden then shifts to defendants to proffer a legitimate, nondiscriminatory reason for his firing. Defendants argue that they reasonably concluded that Woodley was tampering with his GPS and "stealing time" because they perceived, investigated, and acted upon a consistent pattern of Woodley's "interfacing with his device at the start of his shift, having it then shut-off for two to three hours, and then go back on when he appeared at his assigned location." Def. Woodley Reply 3. This is clearly a nondiscriminatory and legitimate reason for Woodley's termination.

The decisive question is, therefore, whether Woodley has come forward with sufficient evidence that this explanation is pretextual, or that defendants' decision, although partly based on legitimate reasons, was also partly motivated by race. *See Holcomb*, 521 F.3d at 142. The Court holds that, even viewing the evidence in the light most favorable to Woodley, and drawing all reasonable inferences in his favor, a reasonable jury could not conclude that Woodley's termination was motivated at least in part by race. Defendants have rebutted any such conclusion with undisputed evidence that a group of GTECH supervisors—beyond the

50

compromised Feiler—investigated Woodley's conduct and reasonably concluded that he was stealing time.

Particularly significant is the testimony of Frank Dimino. Dimino had been Woodley's immediate supervisor, and he had written rave performance reviews of Woodley. *See* Pearson Decl., Exs. 33, 36. Dimino was twice tasked by Feiler—once in February 2013, again in August 2013—with evaluating whether Woodley's GPS reports showed that he was turning his phone/GPS off inappropriately. Both times, Dimino concluded that they did. *See* Pl. 56.1, ¶¶ 109, 119. Woodley's contention that Dimino's conclusions were "facially preposterous," *id.* ¶ 109, is far wide of the mark: It is Woodley who offers preposterous explanations for his GPS reports—*e.g.*, that all of Manhattan is a cellular "dead zone." Woodley Dep. 159. And Woodley has come forward with no evidence impugning Dimino's motivations. That a non-discriminator at GTECH independently reached, and that GTECH relied on, a finding of time theft strongly undermines any claim of pretext.

The evidence that Feiler appreciated that there were limits to the reliability of the GPS reports does not compromise the independence of Dimino's conclusions. In any event, Feiler's testimony on this issue, *see* Feiler Dep. 110–18, does not suggest that he ever believed the GPS was so unreliable as to explain away the evidence of Woodley's time theft (*e.g.*, that the GPS could habitually fail to transmit an FST's location for several hours, even when the FST was actually in his work zone with his phone and GPS turned on).

Nor is the fact that Feiler imposed a lesser sanction on Vinnie Allred for stealing time sufficient to support a finding that Woodley's firing was pretextual. Like Woodley, Allred is African-American. *See* McDonald Dep. 141. Feiler's imposition of a lesser sanction on him for stealing time does not suggest that Woodley's race (as opposed to the different facts relating to

the two men) were the basis for the different sanctions.[25]  To be sure, an employer's charitable treatment of some employees belonging to a protected class does not alone *disprove* a claim of discrimination against other members of that class, *see Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001), but nor does it help affirmatively *prove* such a claim.  If anything, GTECH's decision to investigate and discipline Allred for stealing time underscores that the inquiry into Woodley for such conduct was not irregular, unreasonable, or in bad faith.

Woodley has also failed to come forward with sufficient evidence that his immediate termination for what GTECH determined to be "gross misconduct" was procedurally irregular, which could support an inference of pretext.  *See Tolbert*, 790 F.3d at 438.  Wyllie testified, without contradiction, that "[f]alsifying time records" is considered "gross misconduct."  Wyllie Dep. 83–84.  Woodley's objection that there is no written policy that specifically says this, *see* Pl. 56.1, ¶ 147, is unpersuasive, because GTECH was under no obligation, before firing Woodley, to have articulated in writing this particular application of its policy against workplace misconduct.  And the fact that Woodley's termination notice listed his violation type as "Misconduct" rather than "Gross Misconduct" does not permit the inference that defendants affirmatively concluded that Woodley had not committed gross misconduct, or that they "shifted their rationale."  Pl. Woodley Br. 17.  Gross misconduct is a subset of misconduct.

Woodley emphasizes the existence of factual disputes about the events of February 2013, arguing that he did not actually engage in any misconduct at that time.  *See* Woodley Dep. 116– 19 (his phone "kept locking up" and Dimino secured him a replacement phone); Feiler Dep. 255

---

[25] Even if Allred were of a different race than Woodley, to the extent that Woodley claims an inference of discrimination towards him could be drawn from the different discipline imposed on Allred, Woodley has fallen far short of establishing that he was "similarly situated in all material respects" to Allred.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted).

(no memory of decrease in Woodley's production at that time).  But even if Woodley's conduct during that month were removed from the equation, his behavior in August 2013 was what triggered the investigation culminating in his firing.  Well before August 2013, Woodley had been aware that he was required to start his shift in Manhattan and to keep his GPS on.  *See* Pl. 56.1, ¶ 113; Woodley Dep. 106.  When Feiler saw a two-week pattern of hours-long gaps in August 2013, he reasonably concluded that Woodley was not meeting these expectations.  He assigned Philip, Woodley's African-American supervisor, to test this conclusion.  And Woodley himself confirmed, in a letter sent days after his termination, that he had not been "running" his GPS, contrary to GTECH's expectations.  Woodley 9/11/13 Letter.

Even construing this evidence in the light most favorable to Woodley,[26] Woodley's claim of discrimination is not supported by sufficient evidence on which a reasonable jury could find that his termination was motivated at least in part by race.  Therefore, defendants' motion for summary judgment on Woodley's federal and state discrimination claims is granted.

### b.    *Under New York City Law*

An independent analysis is required under the more protective NYCHRL.  The Second Circuit has held that "the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."  *Mihalik*, 715 F.3d at 110 n.8.  "The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that

---

[26] To be clear, the Court does not rely on the evidence that Woodley gave contradictory explanations for the suspicious GPS data—one to the effect that he was working from home, and another to the effect that he was working in his van.  That evidence appears to be disputed.  *See* Woodley Dep. 331.

'discrimination played no role' in its actions." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40 n.27) (alterations omitted).

Importantly, however, the Second Circuit has observed that the causation inquiry prescribed by the NYCHRL "closely mirrors the questions that courts must answer when resolving summary judgment motions on Title VII claims." *Chen*, 805 F.3d at 76 n.13.  As the Court noted *supra* Section II(B)(1)(b), there is no distinction between the "motivating factor" test under federal law and the "played no role" test that courts sometimes invoke under the NYCHRL.  And the standards for assessing pretext under municipal and federal law do not diverge widely, either.  "Even under the NYCHRL, the mere fact that a plaintiff may disagree and think that [his] behavior was justified does not raise an inference of pretext." *Chen*, 805 F.3d at 76 (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 36 (1st Dep't 2012)) (internal quotation marks and alterations omitted).  "In determining whether the reason for an adverse action was pretextual, it is not for the Court to decide whether the complaints against plaintiff were truthful or fair, as long as they were made in good faith." *Melman*, 946 N.Y.S.2d at 36 (internal quotation marks and alterations omitted).

Here, even under the NYCHRL, defendants are entitled to summary judgment.  There is substantial, and undisputed, evidence that defendants "formed a good-faith belief" that Woodley had been stealing time from GTECH. *Kaiser v. Raoul's Rest. Corp.*, 976 N.Y.S.2d 59, 60 (1st Dep't 2013).  Woodley attempts to "conflate the purported falsity" of defendants' conclusions that he was engaged in misconduct with the "legitimacy of defendants' belief," but these are separate issues. *Id.*  The record establishes as a matter of law that discrimination played no role—*i.e.*, was not a motivating factor—in the decision to terminate Woodley.

2.      **Hostile Work Environment Claim**

a.      *Under Federal and State Law*

As noted, a hostile work environment claim under federal law requires plaintiff to show,

*inter alia*, "that the discriminatory harassment was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Tolbert*,

790 F.3d at 439 (internal quotation marks omitted).  Further, the plaintiff "must also subjectively

perceive that environment to be abusive."  *Alfano*, 294 F.3d at 374.  Woodley fails to provide

sufficient evidence on both the objective and subjective components of his federal and state

claims of hostile work environment.

As to objective severity:  Woodley testified that he heard Feiler call another FST a "lazy

nigger."  Woodley Dep. 192.  He testified this was the only time he heard Feiler use that word,

*id.* at 201, although Uddin testified that he and Woodley both heard Feiler say, "I cannot deal

with these niggers."  Uddin Dep. 145–46.  Woodley also testified that Uddin told him that Feiler

said "because niggers are monkeys, something of that aspect."  Woodley Dep. 369–70.

Thus, unlike Philip, Woodley was never personally addressed using a racial slur; he was

aware of at most three slurs; and he overheard one or, possibly, two of them.  Although any use

of racial slurs is unjustifiable, under the case law, such isolated, sporadic, and de-personalized

epithets are not "severe or pervasive enough to create an objectively hostile or abusive work

environment."  *Harris*, 510 U.S. at 21; *see also Kenchi v. Hanesbrands Inc.*, No. 10 Civ. 1662

(PKC), 2011 WL 4343418, at *4 (S.D.N.Y. Aug. 12, 2011) (two references to plaintiff as "the

black one" or "the black guy" and one email calling him a "nigger" insufficient to create hostile

work environment under federal law); *Fraser v. Fiduciary Trust Co. Int'l*, No. 04 Civ. 6958

(PAC), 2009 WL 2601389, at *8 (S.D.N.Y. Aug. 25, 2009) (one "nigger" comment by

supervisor and disparaging remarks about African-Americans by another employee not sufficient under federal law), *aff'd*, 396 F. App'x 734 (2d Cir. 2010) (summary order).

Therefore, Woodley's federal hostile work environment claim is dismissed, as is his substantively identical claim under the NYSHRL.[27]  The Court turns to the more protective standards of New York City law.

*b.*     *Under New York City Law*

New York courts interpreting the NYCHRL have rejected the "severe or pervasive" test. *See Williams*, 872 N.Y.S.2d at 38 ("[T]he 'severe or pervasive' test reduces the incentive for employers to create workplaces that have zero tolerance for conduct demeaning to a worker because of protected class status.").  Under the NYCHRL, summary judgment is available only when the employer "can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences."  *Id.* at 41.

Defendants claim that such is the case here.  But the cases they cite (and other cases granting summary judgment under the NYCHRL) involved slights more petty, or inconveniences more trivial, than those Woodley testified to having experienced.  *See Mullins v. Consol. Edison Co. of N.Y., Inc.*, No. 13 Civ. 6800 (LGS), 2015 WL 4503648, at *5 (S.D.N.Y. July 22, 2015) (granting summary judgment on NYCHRL claim where plaintiff relied solely on "occasional jokes" with racial tint, and on comment that she "speaks well"); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 676 (S.D.N.Y. 2012) (under NYCHRL, "single statement [that defendant did not like blacks] is insufficient to establish that Plaintiff was subject to a hostile work environment because of her race"); *Benjamin v. Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB),

---

[27] Defendants separately argue that these claims must be dismissed based on the *Faragher–Ellerth* defense.  *See* Def. Woodley Br. 21–22.  The Court need not reach this argument.

56

2012 WL 3188764, at *12 (S.D.N.Y. Aug. 2, 2012) (plaintiff's "inconsistent, contradictory and uncorroborated testimony" that supervisor once called her a "nigger" failed to raise genuine issue of material fact under NYCHRL); *Boakye-Yiadom v. Laria*, No. 09 Civ. 622 (DRH), 2012 WL 5866186, at *10 n.12 (E.D.N.Y. Nov. 19, 2012) (under *federal* law, "the single use of the word 'nigger' or any other racial epithet is not enough to establish a hostile work environment claim").

Defendants also cite a report and recommendation issued in *Crawford v. North Shore– Long Island Jewish Health Sys., Inc.*, 13 Civ. 3894 (JFB) (ARL) (E.D.N.Y. Feb. 22, 2016). *See* Def. Woodley Reply 8. But defendants fail to disclose that Judge Bianco declined to adopt the Magistrate's recommendation. Judge Bianco held that two incidents, about a year apart, in which a noose was displayed in the plaintiff's workplace *were* sufficient to survive summary judgment on the NYCHRL claim. *Crawford*, 13 Civ. 3894, Dkt. 80, at 17–20 (E.D.N.Y. Apr. 4, 2016); *see also Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 453 (E.D.N.Y. 2011) (single public display of noose sufficient to survive summary judgment under federal/state law).

Significantly, as the Second Circuit has recognized, "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210 (2d Cir. 2010) (summary order) (quoting *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)) (internal quotation marks and alteration omitted). The Court therefore concludes that, under the more protective standards of New York City law, an African-American plaintiff's personal observation of his supervisor using the term "lazy nigger"—combined with other,

secondhand evidence of racial bias[28]—is sufficient for a reasonable jury to conclude that the plaintiff was subjected to more than mere "petty slights or trivial inconveniences." *Williams*, 872 N.Y.S.2d at 41.

As to the subjective component of plaintiff's claim, there is sufficient evidence that Woodley actually perceived his work environment as abusive. To be sure, Woodley, unlike Philip, did not work in the Bronx depot with Feiler every day; he came there about once a week. *See* Pl. 56.1, ¶ 151. And Woodley cites no record evidence that he "specifically avoided spending time at the Bronx depot." Pl. Woodley Br. 20. But Woodley did testify that overhearing Feiler call another African-American FST a "lazy nigger" did not surprise him because Feiler consistently behaved "like somebody who is biased and racist." Woodley Dep. 201. And while Woodley testified that he "chuckled at it a little bit and [ ] blew it off," *id.* at 199, he later clarified that he chuckled ruefully, because the office was "going backwards again." *Id.* at 384. Under the protective standards of the NYCHRL, this evidence is sufficient to create a triable issue of fact about whether Woodley subjectively perceived his working environment to be abusive.

---

[28] Defendants cite *Fenner v. News Corp.*, No. 09 Civ. 9832 (LGS), 2013 WL 6244156, at *15 (S.D.N.Y. Dec. 2, 2013), for the proposition that "Woodley cannot support his claims by borrowing allegations that Feiler made additional racially charged statements directed at other people, outside his presence, and outside his work environment." Def. Woodley Reply 8. But the Second Circuit has held that "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." *Schwapp*, 118 F.3d at 111. And, while Feiler's alleged slurs about Uddin (*e.g.*, "terrorist" and "towel head") "may be of limited probative value," they "cannot be ignored." *Id.* at 112. "Remarks targeting members of other minorities . . . may contribute to the overall hostility of the working environment for a minority employee." *Cruz*, 202 F.3d at 570. Finally, defendants have not established that Feiler was "outside" Woodley's work environment simply because Woodley spent most of his working hours in the field. *Fenner* is factually inapposite because the plaintiffs there relied on secondhand stories spanning many years and involving individuals outside their immediate chain of supervision. *See* 2013 WL 6244156, at *2. Here, by contrast, Feiler supervised Woodley's direct supervisor.

For these reasons, the Court denies defendants' summary judgment motion as to Woodley's NYCHRL hostile work environment claim.

### C.     Uddin

Uddin, who remains employed at GTECH, is an FST working out of the Bronx depot. Uddin claims that he was subjected to a hostile work environment because Feiler called him names like "terrorist" and "towel head" and unjustifiably searched his van claiming to be looking for bombs.  Defendants principally maintain that Uddin's complaints about Feiler's alleged conduct were adequately investigated and found baseless.

Uddin and others testified that, during the time Feiler was Uddin's supervisor in the GTECH depot (less than two years), they overheard him using a number of offensive slurs—like "terrorist," "towel head," "Taliban," and "Bin Laden"— relating to Uddin's race, religion, or national origin.[29]  Further, Uddin and Philip testified that Uddin's company vehicle was singled out for excessive and personal attention from Feiler, and that Feiler would make comments about bombs, explosives, or terrorists while searching the van.  A reasonable jury that credited this testimony could readily conclude that the harassment was sufficiently severe or pervasive to create an abusive working environment.  *Tolbert*, 790 F.3d at 439.[30]

---

[29] The parties do not belabor the proper classification of each alleged comment.  Uddin testified that he complained to Philip that Feiler was "mistreat[ing]" him because of his "race, religion, and [] national origin."  Uddin Dep. 481.

[30] Defendants argue that the events in and around June 2011 are not cognizable because they are time-barred.  *See* Def. Uddin Br. 10.  Defendants also argue that Uddin's Title VII claim is limited to events occurring within 300 days of his EEOC charge (filed on February 26, 2015).  *Id.*  However, the Supreme Court has held that, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability," unless the acts inside and outside the filing period have "no relation" to each other or there was an "intervening action" by the employer.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117–18 (2002).  Clearly, then, all of the evidence pertaining to the period when Feiler was Uddin's supervisor (starting in December 2012) is cognizable.

Defendants argue that they are entitled to the protection of the *Faragher–Ellerth* defense—an affirmative defense requiring the employer to show that it "[1] exercised reasonable care to prevent and correct any harassing behavior and [2] that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer [or] to avoid harm otherwise." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (quoting *Faragher*, 524 U.S. at 807) (internal quotation marks and alterations omitted).  Absent this defense, an employer is strictly liable for the misconduct of a supervisor like Feiler.  *See id.*

The Court need not resolve whether defendants' investigative and corrective steps satisfy the *Faragher–Ellerth* defense.  This defense is unavailable under the NYCHRL, and Uddin will therefore survive summary judgment on his NYCHRL hostile work environment claim either way.  Specifically, as summarized *supra* Section II(B)(3)(c), the New York Court of Appeals— answering a certified question from the Second Circuit—held that the *Faragher–Ellerth* defense is inapplicable to NYCHRL claims of sex-based hostile work environment.  *See Zakrzewska*, 14 N.Y.3d at 475.  The Second Circuit acknowledged that the Court of Appeals had "answered our certified question in the negative concluding that the *Faragher–Ellerth* defense *does not apply in cases brought under the NYCHRL.*"  *Zakrzewska v. New Sch.*, 620 F.3d 168, 170 (2d Cir. 2010) (emphasis added).  Because *Zakrzewska* was based on the "plain language" of the NYCHRL, which applies equally to race-based and sex-based harassment, *see Zakrzewska*, 14 N.Y.3d at 479, any attempt to limit this decision to sex-based claims would be unavailing.  *See Armstrong*, 2015 WL 992737, at *6 (acknowledging *Zakrzewska* in race-based harassment context); *Abel*, 2012 WL 6720919, at *23 (instructing a jury that, under the NYCHRL, "if plaintiff proves that an employee with managerial or supervisory responsibility subjected plaintiff to a hostile work environment on the basis of his race, color or national origin, then defendant would be liable for

that conduct regardless of whether defendant was made aware of the manager's conduct or took reasonable steps to correct and prevent it").

Therefore, on Uddin's NYCHRL claim, GTECH's anti-discrimination policies and measures are relevant only to damages, not to its liability. *See Zakrzewska*, 14 N.Y.3d at 479–80. And while the *Faragher–Ellerth* defense potentially could enable defendants to defeat liability on Uddin's federal and state hostile work environment claims, it is not at all clear to the Court that there is any productive value in resolving that issue. Because the Court is not aware of any reason Uddin's recovery under the NYCHRL could be less than his recovery under his parallel federal and state claims, and because the standards for liability under the NYCHRL are less demanding than under federal and state law, there appears to be no need or value for Uddin to proceed to trial on the federal and state claims alongside the parallel NYCHRL claim. On the assumption that Uddin will forego pursuing those duplicative and harder-to-establish claims at trial in favor of pursuing the NYCHRL claim, the Court accordingly declines to address defendant's motion for summary judgment as directed to the federal and state claims. The Court directs that Uddin notify the Court, within three weeks of this decision, whether, based on the Court's ruling that his NYCHRL claim of a hostile work environment can proceed to trial, he will voluntarily dismiss the parallel federal and state claims.[31]

### D.    Accessory Liability

Each plaintiff also brings a claim against Feiler individually, under state and municipal law, for "aiding and abetting" discrimination. Under both state and municipal law, however, individuals may not be held liable for aiding and abetting their own discriminatory conduct. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367–68 (S.D.N.Y. 2012);

---

[31] Regardless, the Court intends to exercise supplemental jurisdiction over Uddin's NYCHRL claim, even if plaintiffs' cases are ultimately bifurcated for trial.

*Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 512–13 (1st Dep't 2014), *leave to appeal denied*, 23 N.Y.3d 908 (2014). Of course, plaintiffs' claims against Feiler survive to the extent they are predicated on Feiler's *direct* liability—that is, his personal participation in discrimination.

## CONCLUSION

For these reasons, the Court grants defendants' motion for summary judgment as to Woodley's federal, state, and municipal discrimination claims; as to Woodley's federal and state hostile work environment claims; and as to all plaintiffs' "aiding and abetting" claims against Feiler. The motion is otherwise denied. In other words, Philip may proceed to trial against GTECH and Feiler on his discrimination, retaliation, and hostile work environment claims; Woodley may proceed to trial against GTECH and Feiler on his NYCHRL hostile work environment claim; and Uddin may proceed to trial against GTECH and Feiler on his hostile work environment claim.

The Court directs the parties to meet and confer within three weeks of this decision about the prospect of settling this case, in whole or in part. By August 11, 2016, the parties are to submit a joint letter alerting the Court to whether any plaintiff's claims have been successfully resolved. To the extent that a settlement has not been reached, a joint pretrial order will be due on September 23, 2016. After the Court reviews the joint pretrial order, the Court's staff will contact counsel to schedule a trial date.

The Clerk of Court is directed to close the motion pending at docket number 68.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 20, 2016
   New York, New York